## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CORTANA GLOBAL LLC**<br>900 Biscayne Blvd., Apt. 3112<br>Miami, FL 33132 | ) <br> ) <br> ) <br> ) | **Case: 1:25−cv−03612 JURY DEMAND**<br>**Assigned To : Unassigned**<br>**Assign. Date : 10/8/2025**<br>**Description: TRO/Prelim. Inj. (D−DECK)** |
| *Plaintiff,* | ) <br> ) | |
| v. | ) <br> ) | **CIVIL ACTION** |
| **DIVERSE GROWTH PARTNERS,**<br>867 Boylston Street, Suite 500<br>Boston, MA 02166 | ) <br> ) <br> ) <br> ) <br> ) | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| **PRIVATE MARKETS CAPITAL LLC,**<br>250 Massachusetts Avenue NW<br>Washington, D.C. 20001 | ) <br> ) <br> ) <br> ) | |
| **DEYLON LOWE,**<br>1100 42nd Street NE<br>Washington, D.C. 20019 | ) <br> ) <br> ) <br> ) <br> ) | |
| **ESBE JALLOH**<br>**a/k/a Solomon Jalloh,**<br>7238 Muncaster Mill Road, Unit 131<br>Derwood, MD 20855 | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| *Defendants.* | ) <br> ) | |

**RECEIVED**

OCT 0 8 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

1

## COMPLAINT

Plaintiff Cortana Global LLC ("Cortana" or the "Plaintiff"), by and through its undersigned counsel, brings this action against Defendants Diverse Growth Partners ("DGP"), Private Markets Capital LLC ("PMC"), Deylon Lowe ("Lowe"), and Esbe Jalloh a/k/a Solomon Jalloh ("Jalloh") and state as follows:

## PRELIMINARY STATEMENT

1.      This action arises from a sophisticated cryptocurrency fraud scheme in which Cortana, a multi-asset strategy fund, was induced to swap over $12.4 million USD into a fraudulent cryptocurrency based on misrepresentations made by Defendant DGP, by and through DGP representative Lowe, and Defendant PMC, by and through PMC representative Jalloh.

2.      The Plaintiff was first introduced to Defendant DGP on September 8, 2025. Defendant DGP represented itself as a strategic investment advisory firm with access to "Verified Sellers" who could sell Bitcoin ("BTC"), a type of cryptocurrency, to Cortana through a peer-to-peer ("P2P") purchase agreement.[1]

3.      On September 19, 2025, Defendant DGP introduced Cortana to Defendant PMC. Defendant PMC claimed to be a hedge fund. Defendant DGP represented Defendant PMC as a "Verified Seller" who would enter into a P2P purchase agreement to sell BTC to Cortana.

4.      Later, on September 19, 2025, Defendant DGP, in concert with Defendant PMC, signed a "Transaction Invoice" (the "Agreement") with Cortana to "present[] for the conversion

---

[1] Peer-to-peer ("P2P") cryptocurrency trading involves the direct exchange of a digital currency between individual parties, without using a centralized exchange or intermediary. *See Peer-to Peer (Virtual Currency): Definition and How it Works*, INVESTOPEDIA, https://www.investopedia.com/terms/p/ptop.asp (last visited October 7, 2025).

of the digital asset of Bitcoin (hereinafter "BTC") into United States Dollar Stable Token (hereinafter "JUSD").[2] Ex. 1.

5.      Under this Agreement, Cortana could only purchase BTC from Defendant PMC with funds that had been transferred into JUSD. The Defendants represented that JUSD was a U.S. dollar-backed stablecoin. This meant that JUSD was tied to the U.S. dollar and therefore could be swapped one-for-one with Tether ("USDT"), a very reputable and widely used kind of cryptocurrency that is also tied to the U.S. dollar.[3]

6.      Defendant PMC was purportedly a shareholder in JUSD.

7.      Most importantly, the Defendants represented that Cortana would be able to convert JUSD back to USDT at any time.

8.      The Agreement, which was drafted by Defendant DGP, outlined a basic procedure for the P2P sale of BTC. This involved Cortana swapping USDT to JUSD; Defendant PMC in turn transferring BTC to Cortana; and Cortana sending an equivalent amount of JUSD to Defendant PMC.

9.      The Agreement specified that the currency swaps would take place in separate "Tranches," and were to take place using Utila, a platform used to manage digital assets across multiple blockchains and wallets, directed to a wallet on the platform controlled by the Defendants.

---

[2] Stablecoins are cryptocurrencies designed to maintain a stable value relative to other assets, like the U.S. dollar or a commodity like gold, and are stored and exchanged on decentralized networks called blockchains. *What are stablecoins, and how are they regulated?*, BROOKINGS INST., https://www.brookings.edu/articles/what-are-stablecoins-and-how-are-they-regulated/ (last viewed on October 6, 2025)..

[3] Tether ("USDT") is the leading stablecoin globally, and it is pegged to the U.S. dollar ("USD"). *What is Tether (USDT)? Understanding Its Importance and Uses*, INVESTOPEDIA, https://www.investopedia.com/terms/t/tether-usdt.asp (last viewed October 6, 2025).

10.    The Defendants lured Plaintiff to the fraudulent transaction by representing that the digital currency swaps would take place on an established cryptocurrency platform called "Utila."

11.    Indeed, in agreeing to make transfers for the first two Tranches in Utila, the Plaintiff relied on Defendant DGP and Defendant Lowe's reputation, as communicated by Clay's business contact, and Defendant Lowe's alleged stake in Utila. The Plaintiff further relied on their independent verification of the legitimacy of Utila and the success of the initial test transfers that were conducted using the established protocol.

12.    However, following two Tranches of successful swaps on Utila, the process failed to function properly and Defendants stated that the third Tranche would need to be swapped directly with wallets controlled by the Defendants.

13.    In agreeing to do so, Cortana relied on Defendant DGP's representations that DPG performed extensive due diligence to authenticate the legitimacy of their "Verified Sellers," due diligence materials pertaining to PMC that Cortana reviewed itself, as well as the successfully completed first two Tranches of swaps.

14.    However, unlike with the first two Tranches and in breach of the Agreement, Defendant PMC failed to transfer the equivalent amount of BTC to Cortana during this third Tranche of transactions.  As a result, Cortana was left with a surplus of JUSD.

15.    In fact, Defendants had weaponized JUSD, a purported stablecoin which turned out to have no genuine backing or affiliation to Defendants, *infra*, ¶¶ 17, 93. JUSD was instead an unstable token propped up just enough for initial trades to build Plaintiff's trust, and was then abandoned.

16.    The equivalent of $8,123,093.05 USD is still held up in JUSD in Cortana's possession, as Cortana has been unable to swap it into USDT—directly contrary to the Defendants' representations.

17.    On September 22, 2025, Cortana reached out to JUSD directly via their website (https://jusd.app/). JUSD informed Cortana that the Cortana Utila wallet was reported as being involved in a scam. JUSD refused to trade Cortana's JUSD.

18.    This was no isolated mishap but a coordinated effort to defraud, with Defendants DGP, Lowe, and others colluding to conceal Defendant PMC's true identities using aliases, redacted KYC documents, and sham addresses to evade detection and induce Cortana's reliance. Defendants' joint misrepresentations about JUSD's legitimacy and convertibility were designed to trap funds, as evidenced by the bait-and-switch in Tranche 3.

19.    This brazen fraud has crippled Cortana's trading capabilities and harmed it and its investors.  This fraud has frozen over $8 million in assets needed for daily operations and growth, while enabling these Defendants to continue to victimize others beyond Cortana in the investment space. This action is being brought to right the injustice caused by Defendants, as further detailed below.

## PARTIES

20.    The Plaintiff is an Island of Nevis limited liability corporation with its principal place of business located at 900 Biscayne Blvd., Apt. 3112, Miami, FL 33132.

21.    Defendant DGP is, upon information and belief, a Massachusetts corporation with its principal place of business located at 867 Boylston Street, Suite 500, Boston, MA 02166. DGP represents itself as a strategic investment and advisory firm. DGP claims to be a strategic partner to high-growth companies and underrepresented founders, providing capital and operational

expertise to facilitate transactions and develop business opportunities in emerging markets. DGP focuses on technology, infrastructure, and defense-related sectors.

22.     Defendant PMC is, upon information and belief, a Washington, D.C. limited liability corporation with its principal place of business located at 250 Massachusetts Avenue NW, Washington, D.C. 20001. PMC claims to be a hedge fund.

23.     Defendant Lowe is, upon information and belief, an individual residing in the District of Columbia at 1100 42nd Street NE Washington, D.C. 20019. Lowe is DGP's Founder and Managing Director.

24.     Defendant Jalloh is, upon information and belief, an individual residing in the State of Maryland at 7238 Muncaster Mill Road, Unit 131, Derwood, MD 20855. Jalloh is PMC's Chief Portfolio Manager.

25.     All conditions precedent to the filing and maintenance of this complaint have been performed, waived, or excused.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (a) there is complete diversity of citizenship between the Plaintiff (Island of Nevis) and the Defendants (Washington, D.C. and Massachusetts); and (b) the amount in controversy exceeds $75,000.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this district.

## CORTANA'S INTRODUCTION TO DGP

28.     Anthony Kerkar ("A. Kerkar") and Cameron Kerkar ("C. Kerkar") founded Cortana Global LLC, a trading-oriented investment firm in the FX and crypto industries, on October 17, 2023. Ex. 2. A. Kerkar and C. Kerkar became registered as Managers on the same day. Ex. 3.

29.     Kenneth Clay ("Clay") is a software entrepreneur and A. Kerkar and C. Kerkar's business partner.

30.     During the summer of 2025, Cortana began looking for a peer-to-peer ("P2P") Bitcoin ("BTC") seller.

31.     A business contact suggested that Clay meet Lowe, the Founder and Managing Director of DGP, as Lowe purportedly maintained a network of verified BTC sellers. Ex. 4.

32.     On September 8, 2025, representatives from Cortana and DGP met via a Zoom meeting to discuss finding a P2P BTC seller.

33.     DGP represented that it had a list of "Verified Sellers" who had gone through DGP's "Know Your Customer" ("KYC") process.

34.     DGP further represented that Lowe was a shareholder in Utila, a legitimate enterprise trading platform that provides secure digital asset custody and transaction infrastructure. DGP claimed that it could fast-track Cortana's onboarding onto Utila and offer a reduced price for access to the platform to facilitate transactions.

## THE DEFENDANTS SET UP THE FRAUDULENT SCHEME

35.     As a condition precedent for finding Cortana a "Verified Seller" of BTC, DGP required that Cortana transfer the assets to be used in the transactions onto the Utila platform.

36.     On September 10, 2025, relying on DGP's representation that Utila was a legitimate enterprise trading platform, Cortana executed an invoice with DGP for access to Utila for $3,500 USD per month. Ex. 5.

37.     On September 12, 2025, in addition to relying on DGP's representations regarding Utila, Clay separately contacted representatives from Utila to confirm the platform's legitimacy and utility. Utila organizers set up a demonstration of the platform to Clay's satisfaction.

38.     On September 18, 2025, Cortana transferred $10,500,000 in Tether ("USDT"), a widely used and highly reputable U.S. dollar-pegged stablecoin, to its Utila wallet.

39.     Cortana notified DGP of this transfer.

40.     DGP confirmed verification of the transfer.

41.     DGP then presented Cortana with three anonymous potential sellers for the P2P purchase. Given the size and timing of Cortana's proposed purchase, DGP recommended the third seller, later identified as Defendant PMC.

42.     Lowe explained that, because this as-of-yet unknown seller had an ownership interest in what was purportedly a new stablecoin called JUSD, the BTC sale required potential buyers to send JUSD to promote traffic in the new stablecoin in order to accelerate the stablecoin's growth. Like USDT, JUSD was purportedly tied to the U.S. dollar and therefore could be swapped one-for-one with USDT.

43.     The Defendants represented that Cortana would be able to convert JUSD back to USDT at any time.

44.     Lowe also shared a procedures sheet describing how the P2P trades with PMC would be conducted. According to this sheet, proof of the Plaintiff's JUSD holdings would trigger PMC's transfer of BTC. Ex. 6.

45.　　On September 19, 2025, DGP shared a redacted Client Information Sheet (CIS) for the third potential seller, Defendant PMC. Ex. 7.

46.　　The Plaintiff expressed concerns about transacting in JUSD but moved forward with Defendant PMC after DGP made additional representations that both the seller and JUSD were reputable and safe.

47.　　DGP further represented that Cortana could swap any purchased JUSD back to USDT at any time.

48.　　DGP then facilitated several initial test transfers to show how to use the Utila platform to swap assets from USDT on Ethereum (a decentralized blockchain), to USDT on Polygon (which operates side chains and other technologies parallel to the main Ethereum blockchain), to JUSD, and back again. These initial test transfers utilized LiFi, a cross-chain bridge and routing protocol integrated within the Utila platform, to facilitate rapid swaps between the digital assets described.

## THE PARTIES SIGN A BINDING AGREEMENT

49.　　On September 19, 2025, Lowe, on behalf of DGP and "in partnership with" PMC, and A. Kerkar, on behalf of Cortana, signed the "Transaction Invoice" (the "Agreement"). Ex. 1.

50.　　PMC was defined as "SELLER" in the first clause. Ex. 1.

51.　　The Parties mutually understood that Cortana was the "BUYER."

52.　　The terms and procedures of the Agreement were clear and mutually understood.

53.　　Per its terms, the Agreement operated as a "BINDING AGREEMENT between the SELLER and BUYER" and required that "each party shall commit to the execution of their respective obligations as detailed throughout the procedures" enumerated in the Agreement. Ex. 1.

54.     Further, the Agreement included a "NON-PERFORMANCE PENALTY in the amount of FIVE MILLION US DOLLARS ($5,000,000.00)" which would be imposed "if either side does not perform as per the procedures set forth in this Transaction Invoice." Ex. 1. Under this clause, the "non-performing party is mutually agreed in breach of contract and liable, without defense, delay and/or obviation, for the payment to the injured party" in the specified penalty amount. Ex. 1.

55.     Specifically, the Agreement states that "if the SELLER fails to send Bitcoin to the BUYER after the BUYER has performed," then the SELLER "is considered in breach." Ex. 1.

56.     The price of the BTC would be the "[t]rading price at the time of delivery of JUSD by BUYER as shown on Blockchain.com minus Three Percent (3%)." Ex. 1.

57.     The transaction followed a set procedure: "(1) BUYER purchases USDT via their Coinbase. (2) BUYER transfers USDT (Polygon ERC20) to their Exodus wallet. (3) BUYER on September 19, 2025, 9:30 am Eastern engages with SELLER via Google Meet link OR Zoom. (4) BUYER performs a swap for a minimum amount of $120,000 USDT to JUSD and provides the SELLER with the dashboard screenshot before and after, along with the hash confirmation. (5) SELLER will transfer BTC to BUYER wallet address at spot price, then the balance after 22 Blockchain confirmations of initial transfer. (6) BUYER will send JUSD for the equivalent amount of BTC. (7) SELLER will make simultaneous payments to all facilitators in Bitcoin, 3% of each tranche of Bitcoin. (8) Repeat steps [4 – 7] until the contracted amount has been exhausted." Ex. 1.

58.     In oral representations, PMC promised that BTC would be delivered within 45 minutes of Buyer's confirmed JUSD purchase.

59.    The Agreement also included a "PROPOSED TRANCHE SCHEDULE" (the "Schedule"). Ex. 1.

60.    The Schedule called for an initial swap, "Tranche 1," for 1 BTC. "Tranche 2" was for 4 BTC, "Tranche 3" was for 95 BTC, and "Tranche 4" was for 100 BTC. The 100 BTC tranches continue until "Tranche 12," for a total sale of 1000 BTC.

## TRANCHE 1: BUILDING FALSE CONFIDENCE

61.    At 2:44 PM EST on September 19, 2025, the Plaintiff and the Defendants initiated Tranche 1 involving 1 BTC, following the procedures set forth in the Agreement.

62.    Cortana used the practiced and agreed upon LiFi protocol on Utila to swap $120,000 USDT into JUSD, equivalent to approximately 1 BTC.

63.    Cortana immediately provided confirmation to DGP via the WhatsApp group chat established between representatives of Cortana and representatives of DGP for the purpose of facilitating the Agreement.

64.    An hour later, DGP sent confirmation of a .99997 BTC transfer from PMC to Cortana-owned wallets held at Wintermute, a global digital asset market maker that provides liquidity across centralized and decentralized trading platforms.  The .99997 BTC transfer from PMC to Cortana-owned wallets was slightly less than what was specified to be transferred in the Agreement.

65.    After receiving the BTC, Cortana sent a payment in form of JUSD as specified in the Agreement to address 0x021DE99F7BE63b5129CFE7d11c73DE43137fE994, previously provided by Lowe as PMC's JUSD receiving wallet (the "JUSD Receiving Wallet").

**TRANCHE 2: DEFENDANTS DOUBLE DOWN ON THEIR FRAUD IN THE FACE OF**

**PLAINTIFF'S QUESTIONS**

66.   After the completion of this first swap, Cortana prepared for Tranche 2 involving 4 BTC.

67.   However, Cortana ran into issues using the agreed protocol.

68.   Around 4:40 PM EST on September 19, 2025, Cortana flagged for DGP that "the swapping functionality is not performing like it did before."

69.   It appeared that there was not enough liquidity backing the new coin to process the larger swap.

70.   Around 5:20 PM EST Cortana successfully swapped $453,028.82 USDT, equivalent to 4 BTC, for JUSD on Utila and provided confirmation of the transaction to DGP.

71.   By 8:35 PM EST, PMC had still not sent the agreed 4 BTC in violation of the terms of the Agreement.

72.   Clay expressed concern to DGP about PMC's commitment and ability to carry out the purchase as agreed. Clay proposed to DGP that Cortana swap their JUSD back to USDT and resume the trades after everyone had a chance to regroup. A. Kerkar Declaration ¶¶ 12, 13 and C. Kerkar Declaration ¶¶ 12, 13.

73.   Shortly thereafter, at 8:46 PM EST, DGP sent confirmation of a 3.4031 BTC transfer from PMC to Cortana's Wintermute wallet, which was again lower than the amount of what was specified to be transferred back to Cortana in the Agreement.

74.   After receiving the funds, Cortana promptly transferred the equivalent 370,098 JUSD to the JUSD Receiving Wallet and the group stopped trading for the night.

## TRANCHE 3: THE BAIT AND SWITCH

75.     On the morning of September 20, 2025, Cortana began preparations for Tranche 3 involving 95 BTC.

76.     Around 9:23 AM EST, after continuing issues with the LiFi swap protocol, DGP relayed a message from PMC suggesting Cortana could swap directly with PMC. PMC offered a 1:1 swap of USDT to JUSD in which PMC would bear any slippage and fees.

77.     Nabhan Ahmed, DGP's WhatsApp Dealflow Organizer, provided PMC's USDT receiving wallet address for the 1:1 trades, 0x6b5c7d0369d9193316e5648d8880f4835fafd431 (the "ERC-20 Receiving Address").

78.     Lowe     provided     the     JUSD     supply     wallet     address, 0x90958F644c365De95BF90E136DFE2607d36fd850 (the "Liquidity Wallet").

79.     Around 9:54 AM EST, Cortana swapped $4,920,000 USDT for JUSD (approximately equivalent to between 43 and 45 BTC), sending the USDT to PMC's ERC-20 Receiving Address and receiving the purported equivalent of JUSD from PMC's Liquidity Wallet.

80.     Cortana sent confirmation to DGP after Cortana received JUSD from PMC's Liquidity Wallet in exchange.

81.     At 1:33 PM EST, several hours after Cortana's swap for JUSD, DGP sent confirmation of a 35.75 BTC transfer from PMC, which was yet again lower than the amount of what was specified to be transferred back to Cortana in the Agreement.

82.     After receiving the BTC and calculating with DGP the value of 35.75 BTC in JUSD, Cortana transferred the equivalent 3,882,688 JUSD to PMC's JUSD Receiving Wallet.

83.     Around 3:50 PM EST on September 20, 2025, eager to fulfill the remainder of the third 95 BTC Tranche, Cortana sent 7,000,000 USDT to PMC's ERC-20 Receiving Address and received the purported 7,000,000 amount of JUSD in return from PMC's Liquidity Wallet.

84.     Cortana immediately provided proof of the transaction to DGP.

85.     Over two and a half hours after the JUSD swap, Cortana was still waiting for PMC to send the corresponding and equivalent BTC.

86.     At 11:17 PM EST Clay demanded that they swap the JUSD back to USDT, as promised during negotiations.

87.     DGP continued to make excuses for PMC, citing multiple reasons for the delay, issues with their two-factor authentication and multi-signature fail-safe protocols—and refusing to broker a swap back to USDT.

88.     Rather than the 60 BTC promised, the Defendants left Cortana with over 8,000,000 in JUSD, which—despite repeated attempts—Cortana could not swap to USDT or to any other useable cryptocurrency.

**THE PLAINTIFF CONTACTS UTILA AND JUSD**

89.     On September 21, 2025, Lowe and the DGP team repeatedly assured Cortana that the BTC transaction would come through.

90.     Cortana continued to demand an immediate swap back to USDT if the BTC transactions could not go through.

91.     On September 22, 2025, Clay contacted Utila to clarify JUSD and Lowe's relationship to the platform. Despite Lowe's representation that he was a shareholder in Utila, Utila informed Clay that Lowe has no ownership interest and is actually a Utila reseller.

92.     A. Kerkar unsuccessfully attempted to try and sell or swap JUSD.

93.     Clay reached out to JUSD directly via their website (https://jusd.app/). JUSD informed him that the Cortana Utila wallet was reported as being involved in a scam and they refused to trade Cortana's JUSD.

94.     In sum, Cortana transferred the equivalent of $12,477,144.28 USD in USDT across four cryptocurrency transfers to both Utila and directly to a DGP and PMC controlled wallet.

95.     In breach of the Agreement, Cortana received total BTC with a value of only $4,354,051.23 USD from PMC.

96.     The equivalent of $8,123,093.05 USD is still stuck in JUSD, as Cortana has been unable to swap it into USDT—directly contrary to the Defendants' representations. Therefore, Cortana suffered a loss of $8,123,093.05 USD.

## CIPHERBLADE TRACES PLAINTIFF'S FUNDS

97.     Following Cortana's Internet Crime Complaint Center ("IC3") submission, preliminary blockchain tracing revealed the defendants' deliberate obfuscation of funds through fragmentation, cross-chain swaps, and deposits to exchanges like Binance and Coinbase (*see* Appendix A for traced wallets).

98.     On September 25, 2025, the Plaintiff retained CipherBlade ("Cipher"), a blockchain forensic tracing firm, to conduct a detailed analysis of the Plaintiff's stolen cryptocurrency assets.

99.     Using blockchain analytics tools and open-source intelligence, Cipher traced the movement of the Plaintiff's assets and identified the wallets used to receive, consolidate, and disperse the misappropriated funds. J. Maile Declaration ¶¶ 9, 21.

100.    Multiple subsequent transactions by the Defendants were structured to frustrate attribution, hinder tracing, and make recovery more difficult. J. Maile Declaration ¶¶ 23, 31.

101. Cipher's investigation revealed that the Defendants directed the Plaintiff's USDT from its ERC-20 Receiving Address to one of five pathways. J. Maile Declaration ¶ 14.

102. The first involved a direct transfer of funds to Coinex Deposit Wallet 0x8ff7992ece4f95b7130438870185f5c04f13270e ("0x8ff"). Over 3,000,000 USDT is traceable to this 0x8ff. J. Maile Declaration ¶ 15.

103. The second pathway involved a direct transfer to Binance Deposit Wallet 0x278e1d17c8a43309b010cadaaa4f6487e3212dde ("0x278"). Over 7,000,000 USDT is traceable to this 0x278. J. Maile Declaration ¶ 16.

104. The third pathway involved a direct transfer of 100,000 USDT to Coinbase Deposit Wallet 0x260a1cfa8d1e50063fd3c7875b4c1963df9c3905. J. Maile Declaration ¶ 17.

105. The remaining funds were sent along more complex pathways. J. Maile Declaration ¶ 18.

106. Over 1,000,000 USDT was sent to a fourth pathway, starting with a transfer to intermediary wallet 0xc8D7274d2bec0F6FB2e152ECf55eFD24D6AAA36 before being split into increasingly small amounts across several intermediary wallets. Some of the funds were distributed to deposit wallets at Binance, HTX, and HitBTC. J. Maile Declaration ¶ 19.

107. Finally, a small portion of funds were sent along a fifth pathway, initiated with a transfer to intermediary wallet 0x728071e2D1738387Da612aC37e3B9D82002817b7. Most of these funds remain on balance in a privately held wallet 0xa01b72b6612f2c40339032ab315bfaad02436bc2. J. Maile Declaration ¶ 20.

108. Cipher's investigation also confirmed that JUSD is most likely an unstable token. J. Maile Declaration ¶ 28.

109.    An unstable token like JUSD lacks the purported market value, utility, or backing of a stablecoin.

110.    These tokens are often minted by bad actors solely to deceive victims into believing they are receiving a valuable asset in exchange for cryptocurrency.

111.    Often, the token is propped up with minimal liquidity to facilitate initial trades to build confidence in the token, like those the Defendants conducted with the Plaintiff.

112.    In reality, the token has limited or no meaningful use or liquidity and cannot be redeemed, traded, or converted on reputable platforms.

113.    Upon information and belief, unstable tokens are a common tactic in digital asset scams, used to induce victims to part with valuable cryptocurrency under false pretenses.

114.    The overall process used by the Defendants reflects deliberate obfuscation techniques. The Defendants deployed asset fragmentation, swap protocols, cross-chain transfers, and commingling to conceal the origin and movement of the Plaintiff's cryptocurrency. J. Maile Declaration ¶ 23

115.    Moreover, upon information and belief Esbe Jalloh is the same Solomon Jalloh indicted with eight counts of wire fraud, resulting in 87 months in federal prison and $2.1M in restitution. Ex. 8. His sentence was confirmed on appeal to the 9th Circuit. *See United States v. Jalloh*, 787 F. App'x 409 (9th Cir. 2019). Ex. 9.

116.    These Court filings list Defendant as "Soloman Jalloh AKA Sulaiman Jalloh, AKA Suliman Jalloh.

117.    The KYC document provided by DGP lists Esbe Jalloh's email address as sbjalloh@privatemarketscapital.com.

118.    The same document lists Esbe Jallow as PMC's "Chief Portfolio Manager," but PMC's Washington, D.C. registration lists its beneficial owners as "SB Jalloh & Co" and "Suliman Jalloh." Upon information and belief, PMC's business address does not appear to be legitimate.

119.    Further, Jalloh lists two domains in his Instagram [@ 1onlysb] biography: PrivateMarketsCapital.com and cryptorealestate.cc.

120.    CryptoRealEstate was also featured on privatemarketscapital[.]com's partner list. Searching for domain registration information and website infrastructure led to an additional domain: cryptorealestate.agency. cryptorealestate.cc and cryptorealestate.agency share a Google Analytics tag [G-JR5SVXY944].

121.    Screenshots from DomainTools below show the Google Analytics tag, as well as the risk score of "100," which is the highest maliciousness risk score Domain Tools uses. DPG's social media links on its website do not work, which are further indicia of a fraudulent operation.

122.    Despite the Defendants' efforts, Cipher successfully traced the Plaintiff's stolen assets to deposit addresses that are hosted by known centralized exchanges. These deposit addresses represent the final known locations of the stolen cryptocurrency and are listed in Appendix A.

123.    Still other assets remain in privately held wallets along this same transaction pathway. These Intermediate Wallets still holding the Plaintiff's USDT are also listed in Appendix A.

124.    There is a high likelihood that the Defendants will continue to move or dissipate the assets if they become aware of this action, thereby eliminating the possibility of recovery.

## COUNT ONE
### Breach of Contract
### (Against Defendants DGP and PMC)

125.    The Plaintiff hereby incorporates by reference paragraphs 1 –124.

126.    The Agreement is a valid and enforceable contract between Defendants DGP and PMC and Plaintiff.

127.    Plaintiff has performed all of its obligations under the Agreement.

128.    Defendants DGP and PMC were obligated under the Agreement to deliver BTC equal to the USDT amount Cortana provided, within the time period provided by the Agreement.

129.    Defendants DGP and PMC breached and have continued to breach the terms of the Agreement by, *inter alia*, (a) failing to deliver BTC equal to the USDT amount Cortana provided, including on September 19 and 20, 2025 and (b) failing to deliver BTC within 45 minutes of Buyer's confirmed JUSD purchase, including on September 19 and 20, 2025.

130.    As a direct result of Defendant DGP and Defendant PMC's breach of the Agreement, Cortana has suffered damages in an amount not less than $8,123,093.05 USD.

## COUNT TWO
### Unjust Enrichment
### (Against All Defendants)

131.    The Plaintiff hereby incorporates by reference paragraphs 1–130.

132.    In the alternative to Count One, the Plaintiff Cortana conferred a benefit on the Defendants each time Cortana swapped USDT into JUSD.

133.    Defendant DGP and Defendant PMC's failure to deliver BTC equal to the USDT amount Cortana provided has resulted in the Defendants being unjustly enriched at Cortana's expense.

134.   Under the circumstances, the Defendants' retention of the $8,123,093.05 USD is unjust. In equity and good conscience, the Defendants should make restitution.

### COUNT THREE
**Promissory Estoppel**
**(Against All Defendants)**

135.   The Plaintiff hereby incorporates by reference paragraphs 1 – 134.

136.   Outside of the Agreement, the Defendants made promises to Cortana, including: DGP was a shareholder in Utila; JUSD was a reputable stablecoin; BTC would be delivered within 45 minutes of Buyer's confirmed JUSD purchase; and Cortana could swap any purchased JUSD back to USDT at any time.

137.   The Defendants should have reasonably expected Cortana would rely on these promises because: Plaintiff performed due diligence related to DGP and PMC; Clay independently verified Utila's legitimacy and utility as an enterprise trading platform with Utila representatives who set up a demonstration of the platform; Defendant DGP facilitated several initial test transfers to demonstrate using the Utila platform to swap assets from USDT to JUSD and back again; and the initial two Tranche swaps were in large part successful and followed the agreed-upon procedures in the Agreement.

138.   Cortana, in reliance on the Defendant's promises, incurred expenses, including but not limited to, transferring the equivalent of $8,123,093.05 USD into JUSD with no recourse for transferring the funds back to USDT.

139.   Cortana will be unjustly damaged if the Agreement, and the express promises of the Defendants are not enforced.

## COUNT FOUR
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Defendants DGP and PMC)

140.    The Plaintiff hereby incorporates by reference paragraphs 1–139.

141.    Defendants DPG and PMC, by their actions in failing to deliver BTC equal to the USDT amount Cortana provided, and also failing to transfer JUSD back to USDT, have negligently, recklessly, willfully, and/or maliciously breached their implied covenant of good faith and fair dealing in their relationship with Cortana, and thereby evaded the spirit of the contract in bad faith.

142.    As a result of Defendants DPG and PMC's breach of their implied covenant of good faith and fair dealing, Cortana has suffered damages in an amount not less than $8,123,093.05 USD.

## COUNT FIVE
### Civil Theft – D.C. Code Ann. § 22-3211(b)
### (Against All Defendants)

143.    The Plaintiff hereby incorporates by reference paragraphs 1–142.

144.    Under D.C. Code § 22-3211(b), "a person commits the offense of theft if that person wrongfully obtains or uses the property of another with intent . . . to deprive the other of a right to the property or a benefit of the property; or to appropriate the property to his or her own use . . ."

145.    The term "wrongfully obtains or uses" is further defined as "obtaining property by trick, false pretense, false token, tampering, or deception." D.C. Code § 22-3211(a).

146.    The Defendants wrongfully obtained the Plaintiff's property by "trick, false pretense, false token, tampering, or deception" when they made false misrepresentations that induced the Plaintiff to transfer funds to the Defendants.

147.    The Defendants did so with the intent to deprive the Plaintiff of the Plaintiff's right to the property and to appropriate the property for the Defendants' own use.

148.    As a result of the Defendants' theft, the Plaintiff has suffered harm in an amount not less than $8,123,093.05 USD.

## COUNT SIX
### Fraudulent Misrepresentation
### (Against All Defendants)

149.    The Plaintiff hereby incorporates by reference paragraphs 1–148.

150.    The Defendants, through the Agreement, made false representations of material facts.

151.    The Defendants, through oral or written representations, made false representations of material fact: DGP was a shareholder in Utila; JUSD was a reputable stablecoin; BTC would be delivered within 45 minutes of Buyer's confirmed JUSD purchase; and Cortana could swap any purchased JUSD back to USDT at any time. All of these facts were material to Cortana entering in to the Agreement.

152.    DGP and PMC knew that DGP was not a shareholder in Utila, and that JUSD was not a reputable stablecoin, and by refusing to broker a swap of JUSD back to USDT after Cortana initiated the Third Tranche, the Defendants knew their previous representations concerning the Agreement were false. After the Agreement was executed on September 19, 2025, the Defendants intended that its representations concerning the Agreement would induce the Plaintiff to act in reliance on the Agreement.

153.    In relying on the false representations, the Plaintiff proceeded with the trades.

154.    As a result of its reliance, the Plaintiff suffered no less than $8,123,093.05 USD in damages.

## COUNT SEVEN
### Negligent Misrepresentation
### (Against All Defendants)

155.    The Plaintiff hereby incorporates by reference paragraphs 1–155.

156.    The Defendants, through the Agreement, made false representations of material facts, including "SELLER will transfer BTC to BUYER wallet address at spot price" after confirmation of the USDT to JUSD swap, and that the "SELLER will make simultaneous payments . . . in Bitcoin" after "BUYER [sends] JUSD for the equivalent amount of BTC." Ex. 1.

157.    The Defendants, through oral or written representations, made false representations of material fact: DGP was a shareholder in Utila; JUSD was a reputable stablecoin; BTC would be delivered within 45 minutes of Buyer's confirmed JUSD purchase; and Cortana could swap any purchased JUSD back to USDT at any time.

158.    By failing to transfer the equivalent amount of BTC back to Cortana, the Defendants knew or should have known their previous representations concerning the Agreement were false.

159.    After the Agreement was executed on September 19, 2025, the Defendants intended that their representations concerning the Agreement would induce the Plaintiff to act in reliance on the Agreement.

160.    In relying on the false representations, the Plaintiff proceeded with the trades.

161.    As a result, the Plaintiff suffered no less than $8,123,093.05 USD in damages.

**COUNT EIGHT**
**D.C. Consumer Protection Procedures Act – D.C. Code Ann. § 28-3904**
**(Against All Defendants)**

162.    The Plaintiff hereby incorporates by reference paragraphs 1–162.

163.    Under D.C. Code Ann. § 28-3904(e), one need only plausibly allege that "merchant 'misrepresented' or 'failed to state' a material fact" related to its good or services" to state a misrepresentation claim.

164.    There is no requirement that any consumer in fact be misled by the deceptive statements. D.C. Code Ann. § 28-3904.

165.    The Defendants were merchants selling services in cryptocurrency trading. The Plaintiff sought their services in order to engage in P2P purchasing of BTC.

166.    As merchants, the Defendants misrepresented material facts related to their services, including that the Plaintiff could swap any purchased JUSD back to USDT at any time.

167.    As a result of the Defendant's conversion of Cortana's property, Cortana has suffered damages.

168.    The Plaintiff should recover punitive and treble damages from the Defendants.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court award the following relief:

a.    Judgment on its behalf for compensatory damages in the amount of $8,123,093.05 USD, plus pre-judgment and post-judgment interest;

b.    Injunctive relief freezing the wallets holding the $8,123,093.05 USD in compensatory damages at issue;

c.    Punitive damages in an amount to be proven at trial;

d.    Treble damages in an amount to be proven at trial;

e.  Costs and attorney's fees expended in this action; and

f.  Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of all issues so triable pursuant to Fed. R. Civ. P. 38.

Dated:  October 8, 2025

Respectfully submitted,

**FOLEY & LARDNER LLP**

*/s/ Olivia S. Singelmann*
Olivia S. Singelmann (D.C. Bar No. 1016299)
Telephone: (202) 295-4146
Jack Korba (D.C. Bar No. 1010303)
Telephone: (202) 295-4110
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007

*Attorneys for Plaintiff Cortana Global LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th of October, 2025, I personally served a copy of the forgoing document to the Clerk of Court.

By: */s/ Jack Korba*_____
Counsel for Plaintiff