## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CORTANA GLOBAL LLC** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | **Case No.:  1:25-cv-3612-RCL** |
| | ) | |
| **DIVERSE GROWTH PARTNERS, PRIVATE** | ) | |
| **MARKETS CAPITAL LLC, DE'LYON** | ) | |
| **LOWE, ESBE JALLOH a/k/a Solomon Jalloh** | ) | |
| | ) | |
| *Defendants.* | ) | |

## CORTANA'S OPPOSITION TO DIVERSE GROWTH
## PARTNERS AND DE'LYON LOWE'S MOTION TO DISMISS

Plaintiff Cortana Global LLC ("Plaintiff" or "Cortana"), by and through undersigned counsel, respectfully moves this Court to deny Defendants Diverse Growth Partners ("DGP") and De'Lyon Lowe ("Lowe") (collectively, the "Defendants") Motion to Dismiss, and states as follows:

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................... 1

II. FACTUAL BACKGROUND ................................................................................. 2

III. STANDARD OF REVIEW .................................................................................. 7

IV. ARGUMENT ........................................................................................................ 8

    A. Cortana Has Stated a Claim for Breach of Contract .................................... 8

        1. Cortana Adequately Alleged that Defendants DGP and Lowe Are
           Parties to the Agreement ...................................................................... 8

           a. DGP and Lowe Are Identified as Partners with PMC and Jalloh
              as the "SELLER" in the Agreement ....................................... 8

           b. Defendants Fail to Cite to Cases That Support Their Argument
              That Defendants Are Non-Parties ........................................... 9

        2. The Complaint Pleads Facts Sufficient to Show Defendants DGP and
           Lowe Had Obligations Under the Agreement .................................... 12

        3. The Complaint Pleads Facts Sufficient to Show that Defendants DGP
           and Lowe Could Be Held Liable as Defendant PMC's Agent ........ 14

        4. Because There is a Contractual Relationship Between Defendants DGP
           and Lowe and Plaintiff, the Covenant of Good Faith and Fair Dealing
           is Applicable ...................................................................................... 16

    B. Cortana's Complaint Complies with the Appropriate Pleading Rules ....... 18

        1. Cortana's Complaint Meets the Rule 9(b) Pleading Standard ......... 18

        2. Cortana's Complaint Complies with Rule 8's Pleading Standard and
           Does Not Engage in Improper Group Pleading ............................... 23

    C. Cortana's Complaint Adequately States a Claim in the Alternative for
        Promissory Estoppel .................................................................................. 24

    D. Cortana's Complaint Adequately States a Claim for Unjust Enrichment ... 26

    E. Cortana's Complaint Adequately States a Claim for Civil Theft ................ 28

    F. Cortana's D.C. Consumer Protection Procedures Act Claim Adequately States
        a Claim Upon Which Relief Can be Granted ............................................. 29

1. Defendants are Merchants Under the CPPA ....................................................... 30

2. Cortana is a Consumer Under the CPPA ........................................................... 32

3. Defendants Engaged in Unfair or Deceptive Trade Practices ........................... 32

**V. CONCLUSION** ........................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adam A. Weschler & Son*, *Inc. v. Klank*,
  561 A.2d 1003 (D.C. 1989) ........................................................................ 32

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*,
  525 F.3d 8 (D.C. Cir. 2008) ....................................................................... 27

*Allworth v. Howard Univ.*,
  890 A.2d 194 (D.C. 2006) .......................................................................... 17

*Am. Prop. Const. Co. v. Sprenger Lang Found.*,
  768 F. Supp. 2d 207 (D.D.C. 2011) ....................................................... 8, 10

*Apprio, Inc. v. Zaccari*,
  104 F.4th 897 (D.C. Cir. 2024) .................................................................. 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................... 7

*Atchinson v. District of Columbia*,
  73 F.3d 418 (D.C. Cir. 1996) ....................................................................... 7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................... 7

*Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of U.S.*,
  325 F.R.D. 6 (D.D.C. 2018) ....................................................................... 19

*Bradley v. National Collegiate Athletic Association*,
  249 F. Supp. 3d 149 (D.D.C. 2017) ........................................................... 14

*Byrd v. Jackson*,
  902 A.2d 778 (D.C. 2006) .......................................................................... 31

*Caldwellv. Argosy Univ.*,
  797 F. Supp. 2d 25 (D.D.C. 2011) ............................................................. 24

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
  148 F.3d 1080 (D.C. Cir. 1998) ................................................................... 7

*Charlton v. Mond*,
  987 A.2d 436 (D.C. 2010) .......................................................................... 11

*Davis v. Winfield*,
  664 A.2d 836 (D.C. 1995) .......................................................................... 12

*Democracy Partners v. Project Veritas Action Fund*,
  285 F. Supp. 3d 109 (D.D.C. 2018) ........................................................... 20

*E.E.O.C. v. St. Francis Xavier Parochial School*,
  117 F.3d 621 (D.D.C. 1997) ................................................................. 22, 28

*Equitas Disability Advocates, LLC v. Bryant*,
   134 F. Supp. 3d 209 (D.D.C. 2015) ................................................................. 11, 12

*Ford v. Chartone, Inc.*,
   908 A.2d 72 (D.C. 2006) ................................................................................... 32

*Headfirst Baseball LLC v. Elwood*,
   168 F. Supp. 3d 236 (D.D.C. 2016) ................................................................. 25

*Heidi Aviation, LLC v. Jetcraft Corp.*,
   573 F. Supp. 3d 182 (D.D.C. 2021) ............................................................. 19, 22

*Henderson v. Phillips*,
   195 A.2d 400 (D.C. 1963) ............................................................................. 15, 16

*In re Fort Totten Metrorail Cases Arising Out of the Events of June 22, 2009*,
   808 F. Supp. 2d 154 (D.D.C. 2011) ............................................................. 13, 14

*Intelect Corp. v. Cellco P'ship GP*,
   160 F. Supp. 3d 157 (D.D.C. 2016) ................................................................. 25

*Iyer v. George Washington Univ. Sch. of Med. & Health Scis.*,
   No. 24-130 (SLS), 2025 WL 2192985 (D.D.C. Aug. 1, 2025) ............................. 17

*Jacobson v. Hofgard*,
   168 F. Supp. 3d 187 (D.D.C. 2016) ......................................................... 20, 22, 23

*Jones v. Quintana*,
   872 F. Supp. 2d 48 (D.D.C. 2012) ............................................................... 10, 11

*LaRoque v. Holder*,
   650 F.3d 777 (D.C. Cir. 2011) ........................................................................... 7

*Lopez Bello v. Smith*,
   651 F. Supp. 3d 20 (D.D.C. 2022) ................................................................... 10

*Lovelace v. Software Spectrum, Inc.*,
   78 F.3d 1015 (5th Cir. 1996) ........................................................................... 28

*McMullen v. Synchrony Bank*,
   164 F. Supp. 3d 77 (D.D.C. 2016) ................................................................... 30

*McWilliams Ballard, Inc. v. Level 2 Dev.*,
   697 F. Supp. 2d 101 (D.D.C. 2010) ................................................................. 27

*Melegrito v. CitiMortgage Inc.*,
   2011 WL 2197534 (N.D. Cal. June 6, 2011) ..................................................... 23

*Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*,
   878 F. Supp. 2d 241 (D.D.C. 2012) ................................................................. 16

*Rapaport v. U.S. Department of Treasury, Office of Thrift Supervision*,
   59 F.3d 212 (D.C. Cir. 1995) ........................................................................... 26

*Remeikis v. Boss & Phelps, Inc.*,
   419 A.2d 986 (D.C.1980) ................................................................................. 20

*Ruffin v. Temple Church of God in Christ, Inc.*,
   749 A.2d 719 (D.C. 2000)................................................................ 14, 15

*Sanchez v. Office of State Superintendent of Educ.*,
   45 F.4th 388 (D.C. Cir. 2022) ............................................................ 7

*Sigal Const. Corp. v. Stanbury*,
   586 A.2d 1204 (D.C. 1991)................................................................ 15

*Smith v. Wells Fargo Bank*,
   991 A.2d 20 (D.C. 2010)................................................................... 15

*Snowder v. District of Columbia*,
   949 A.2d 590 (D.C. 2008)................................................................. 30

*Stone v. Landis Const. Co.*,
   120 A.3d 1287 (D.C. 2015)............................................................... 32

*Sundberg v. TTR REALTY, LLC*,
   109 A.3d 1123 (D.C. 2015)............................................................... 30

*U.S. ex rel. Bender v. North American Telecomm., Inc.*,
   750 F. Supp. 2d 1 (D.D.C. 2010) ...................................................... 24

*U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*,
   389 F.3d 1251 (D.C. Cir. 2004) ........................................................ 18

**Statutes**

D.C. Code § 22-3211(b) ........................................................................ 28

D.C. Code § 22-3211(a) ........................................................................ 28

D.C. Code § 28-3904 ............................................................................ 30

D.C. Code § 28-3901(c) ........................................................................ 30

D.C. Code § 28-3904(h) ........................................................................ 31

D.C. Code § 28-3901(a)(3)(A) .............................................................. 30

D.C. Code § 28-3901(a)(7) .................................................................... 30

D.C. Code § 28-3901(2)(A) ................................................................... 32

**Rules**

Fed. R. Civ. P. 8(a)(2) ........................................................................... 7

Fed. R. Civ. P. 9(b) .......................................................................... passim

Fed. R. Civ. P. 12(b)(6) ...................................................................... 1, 7

**Other Authorities**

Restatement (Second) of Torts §529 (1977) .......................................... 20

## I.    <u>INTRODUCTION</u>

Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof ("Def. Motion") relies heavily on the mistaken premise that Defendants were not a party to the "Transaction Invoice" (the "Agreement"). To the contrary, Defendants were part of a specified party within the written Agreement itself that included Cortana and Defendants Private Markets Capital LLC ("PMC"). In addition, Defendants DGP and Lowe attempt to distance themselves after the fact from their active procurement and facilitation of the Agreement and the ultimate benefit they were to receive as a reward for their involvement. However, Defendants played an instrumental role in convincing Cortana to engage in the transactions at issue. Defendants cannot now claim minimal involvement and ignorance in order to absolve themselves of the fact that they fraudulently induced Cortana to enter into a written contract, facilitated the perpetration of the underlying scheme and ultimate breach of that contract, and unjustly benefitted from the breach of contract and misappropriation of funds.

Defendants' Motion relies on conclusory statements and misconstrued facts. Defendants were the driving force behind Cortana's entrance into the Agreement with Defendants PMC and Jalloh and Defendants were intimately involved every step of the way. Indeed, without Defendants' fraudulent misrepresentations and actions, Cortana never would have entered into this arrangement and would not have been wrongfully deprived of over $8 million in digital assets. Defendants entered into the Agreement fully aware of their status, obligations, and anticipated financial benefit as a party to the contract. Since Cortana's Complaint adequately meets any and all pleading requirements under Federal Rules of Civil Procedure 8(a) and 9(b), Defendants' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) should be denied.

## II.    FACTUAL BACKGROUND

In their Motion, Defendants DGP and Lowe acknowledge that the Court is required to accept all well-pleaded allegations of the Complaint as true on a motion to dismiss (Def. Motion at 4, 5). But DGP and Lowe ignore essential factual allegations which show that Cortana has sufficiently pled its breach of contract, fraud, promissory estoppel, and related claims.

As Defendant Lowe acknowledges, Cortana was introduced to DGP and Lowe, in Lowe's capacity as DGP's managing director, in early September 2025 (Def. Motion at 2; Compl. ¶¶ 31, 32). Cortana was looking for a peer-to-peer ("P2P") Bitcoin ("BTC") seller, and a business contact suggested Lowe maintained a network of verified BTC sellers (Compl. ¶¶ 30, 31). On September 8, 2025, Cortana and DGP representatives met via Zoom to discuss finding a P2P BTC seller (Compl. ¶ 32). On this call, DGP represented that it had a list of "Verified Sellers" who had complied with DGP's due diligence and "Know Your Customer" processes, building trust with Cortana—facts the Defendants fail to address in their Motion (Compl. ¶ 33).

However, DGP said it would only agree to find Cortana a "Verified Seller" if Cortana transferred the assets to be used in the transaction onto Utila (Compl. ¶ 35). According to DGP's representations, this was because: Lowe was a shareholder in Utila, DGP could fast-track Cortana's onboarding onto Utila, and DGP could offer a reduced price for access to the trading platform to facilitate transactions (Compl. ¶ 34). Again, Defendants conveniently leave these facts out in their Motion.

Relying on DGP's representations about Utila, and after performing its own due diligence about the platform, Cortana executed an invoice with DGP for access to Utila for $3,500 USD per month on September 10, 2025 (Compl. ¶¶ 36, 37). To comply with DGP's conditions for proceeding with finding a "Verified Seller," Cortana transferred $10,500,000 in Tether ("USDT")

to its Utila wallet on September 18, 2025 (Compl. ¶ 38). Cortana notified DGP of the transfer, and DGP confirmed verification of the transfer (Compl. ¶¶ 39, 40).

Having successfully complied with DGP's condition precedent, DGP then presented Cortana with just three anonymous potential "Verified Sellers" for the P2P BTC purchase (¶ 41; Def. Motion at 3). DGP strongly recommended that Cortana proceed with the third of these "Verified Sellers" based on the size and timing of Cortana's proposed purchase (Compl. ¶ 41). DGP kept the identity of this third "Verified Seller" anonymous, providing Cortana with a redacted Client Information Sheet that did not disclose any identifying information about the "Verified Seller," thereby limiting Cortana's ability to conduct any due diligence of their own (Compl. ¶ 45; Compl. Ex. 7). Cortana did not "independently select[] PMC as its counterparty," as the Defendants suggest, but instead Cortana relied on DGP's representations that the then-anonymous third "Verified Seller" was reputable, legitimate, and had complied with DGP's "Know Your Customer" process (Compl. ¶¶ 33, 41, 42; Def. Motion at 3). The true identity of the seller was not identified until it was too late for any independent due diligence. But–for DGP and Lowe's recommendation, Cortana would not have known about Defendant PMC, let alone selected Defendant PMC for the transactions (Compl. ¶ 41).

When describing the as-of-yet unknown seller to Cortana, Lowe explained that the seller had an ownership interest in a stablecoin called JUSD (Compl. ¶ 42). Therefore, the anonymous seller required potential buyers to send JUSD in exchange for BTC to promote traffic to JUSD and accelerate growth (Compl. ¶¶ 42, 44). Lowe said that JUSD was tied to the U.S. dollar and could be swapped one-for-one with USDT (Compl. ¶ 42). Lowe represented numerous times that Cortana would be able to convert JUSD back to USDT at any time (Compl. ¶¶ 42, 43, 46, 47). To further instill full confidence in Cortana, DGP facilitated several test transfers to show Cortana how to use

Utila to swap assets from USDT to JUSD and back again (Compl. ¶ 48). Feeling confident in the "Verified Seller's" legitimacy based on Lowe and DGP's repeated representations, Cortana decided to move forward with the process and execute the "Transaction Invoice" (the "Agreement") (Compl. ¶¶ 46, 49).

Defendants entirely omit the essential fact that Lowe *himself* executed the "Agreement" with Cortana on September 19, 2025 (Compl. ¶ 49; Compl. Ex. 1). Instead, Defendants falsely claim that PMC executed the Agreement (Def. Motion at 3). Lowe's handwritten signature speaks for itself on the third page of the Agreement (Compl. Ex. 1 at 3).

Moreover, DGP and Lowe fail to accurately quote the terms of the Agreement and, in doing so, obscure how the terms "BUYER" and "SELLER" were mutually understood to be defined by Cortana, Defendants DGP and Lowe, and Defendants PMC and Jalloh (hereinafter, the "Parties"). First, the term "BUYER" is never explicitly defined anywhere in the Agreement, contrary to Defendants' allegation that the Agreement "expressly defines . . . Cortana as the 'BUYER'" (Def. Motion at 3; Compl. Ex. 1). Cortana is mentioned explicitly only twice in the Agreement, and neither time is Cortana identified expressly as the Buyer. First, the Agreement is addressed "**To: Cortana Global LLC**" at the top of the first page (Compl. Ex. 1) (emphasis in original). Second, on the third page of the Agreement, Anthony Kerkar ("A. Kerkar") signed the Agreement "for and on behalf of **BUYER**" in his capacity as "Signatory" for "**Cortana Global LLC**" (Compl. Ex. 1) (emphasis in original). The Parties relied on the broader context surrounding the Agreement to import into the terms of the Agreement their mutual understanding that Cortana was the Buyer. Even though Cortana is never explicitly identified as the Buyer, Defendants seemingly have no issue concluding that Cortana was definitively the "BUYER" based on these two limited mentions of Cortana.

4

In comparison, the very terms of the Agreement provide substantially more information indicating the Parties understood Lowe, as Managing Director of DGP, and DGP to be part of the Seller's side. First, the term "SELLER" is explicitly defined in the first clause as "**Delyon Lowe, Manager Director of Diverse Growth Partners** *in partnership* with **Private Markets Capital LLC**" (Compl. ¶¶ 4, 49, 50; Compl. Ex. 1) (bold emphasis in original) (italicized emphasis added). DGP and Lowe omit this key language from the Agreement in their description of the terms (Def. Motion at 3). The plain reading of this language is far more instructive in indicating that Lowe and DGP were intended to be parties on the Seller's side than any language in the Agreement regarding Cortana's role in the transaction.

Second, by its own terms, the Agreement specifically states that DGP, Lowe, and PMC were partnering in the contract as interested parties (Compl. ¶ 49; Compl. Ex. 1). This relationship is further illustrated on the second page of the Agreement which references a "SELL SIDE FACILITATOR" who is entitled to a facilitation fee percentage for their involvement (Compl. Ex. 1 at 2). Upon information and belief, the "SELL SIDE FACILITATOR" refers to Defendants (Compl. Ex. 1 at 2).

Finally, as previously stated, Lowe signed the Agreement "for and on behalf of **SELLER**" in his capacity as "Manager Director" of "**Diverse Growth Partners, LLC**" on the third page of the Agreement (Compl. Ex. 1 at 3) (emphasis in original). The construction of the signature block that Lowe executed is exactly the same as the construction of the signature block that A. Kerkar executed, down to the use of bold font (Compl. Ex. 1). As such, Lowe executed the Agreement as a party on the Seller's side just as A. Kerkar executed the Agreement as a representative of Cortana on the Buyer's side. Defendants are comfortable concluding Cortana was the "BUYER" based on

the plain language of the Buyer's signature block; therefore, it follows that DGP was a "SELLER" based on the identical plain language of the Seller's signature block.

By its own terms, the Agreement operated as a "BINDING AGREEMENT between the SELLER and BUYER," and it required that "each party shall commit to the execution of their respective obligations as detailed throughout the procedures" as enumerated in the Agreement (Compl. ¶ 53, Compl. Ex. 1). As DGP and Lowe accurately state, the Agreement assigns all performance obligations, including the obligation to transfer BTC, to either the Buyer or Seller (Def. Motion at 3; Compl. ¶¶ 53–57; Compl. Ex. 1).

As is thoroughly detailed in the pleadings, Cortana completed the first two tranches per the terms of the Agreement on September 19, 2025 (Compl. ¶¶ 61–65). Defendants highlight that Cortana does not allege in the pleadings that DGP or Lowe sent or received any cryptocurrency in connection with these two tranches — this is because Cortana does not know, and it is logical to explore this in Discovery (Def. Motion at 3). For example, DGP and/or Lowe could have had control over the recipient wallet or could have received Cortana's cryptocurrency after the successful transfers. Contrary to the assertions in Defendants' Motion, Cortana's blockchain tracing did not definitively lead back to which of the Defendants actually owned the destination wallets (Def. Motion at 2). Nowhere in the Complaint did Cortana allege that the cryptocurrency tracing efforts identified which of the Defendants owned the wallets or accounts through which Cortana's digital assets transited or were held (Compl. ¶¶ 97-114). Instead, the Complaint detailed a complex money laundering process Defendants engaged in that was meant to conceal the origin and movement of Cortana's cryptocurrency (*Id.*). For all Cortana knows, Defendants were the ultimate beneficiaries of the transferred assets and/or received their specified facilitation fee. This is the type of definitive information to be determined through the Discovery process.

As is also thoroughly detailed in the pleadings, DGP instructed Cortana to swap directly with PMC to complete the third tranche (Compl. ¶ 76; *see generally* Compl. ¶¶ 75-88). Lowe provided Cortana with PMC's JUSD wallet address (Compl. ¶ 77). Cortana does not know with certainty which Defendant individuals or entities control the blockchain pathways that they used to send USDT in the third tranche—again, facts to explore through discovery.

However, Cortana's investigation after the purloinment of their assets did reveal vital information: that Defendant Jalloh was a convicted felon, that Defendant PMC's provided business address did not appear to be legitimate, and that certain Internet domains utilized by Defendants PMC and Jalloh were indicative of malicious activity and fraud (Compl. ¶¶ 115–121).

## III.    <u>STANDARD OF REVIEW</u>

Under Fed. R. Civ. P. 8(a)(2), a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Cortana's complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when "plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In assessing the sufficiency of the pleadings, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Sanchez v. Office of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (citing *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011)). A plaintiff need not allege all the facts necessary to prove its claim so long as it provides enough factual information to make clear the substance of that claim. *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1086 (D.C. Cir. 1998) (citing *Atchinson v. District of Columbia*, 73 F.3d 418, 421-22 (D.C. Cir. 1996)).

# IV.    ARGUMENT

## A.  Cortana Has Stated a Claim for Breach of Contract

Defendants DGP and Lowe assert that Cortana's breach of contract claim fails for two reasons: First, that "Cortana fails to allege a valid contract between itself and DGP, as DGP is not a party to the alleged agreement" (Def. Motion at 5). But the very terms of the Agreement explicitly identify "Delyon Lowe, Manager Director of Diverse Growth Partners" as a part of the Seller's side along with Defendant PMC (Compl. ¶¶ 4, 49, 50; Compl. Ex. 1 at 1). Second, that Cortana did "not identify any obligations or duties either DGP or Mr. Lowe owed Cortana under the Agreement" (Def. Motion at 7). The Agreement, however, meticulously details the obligations and duties owed by the Seller, and includes reference to a Sell Side Facilitator (Compl. ¶¶ 53–57; Compl. Ex. 1). Because the Agreement identifies DGP, Lowe, and PMC as partners on the Seller's side, DGP and Lowe therefore owed Cortana, the Buyer, performance of those obligations and duties. At the bare minimum, DGP and Lowe owed facilitator obligations to Cortana. Additionally, Cortana adequately pled that the parties to the contract manifested an intent to be bound by the Agreement's terms. (Compl. Ex. 1). As such, Cortana has indeed satisfied its "burden of proving the existence of an enforceable agreement," *Am. Prop. Const. Co. v. Sprenger Lang Found.*, 768 F. Supp. 2d 207, 211 (D.D.C. 2011), and stated a plausible claim for relief for breach of contract by Defendants.

### 1.  *Cortana Adequately Alleged that Defendants DGP and Lowe Are Parties to the Agreement*

Defendants' argument that they are "non-parties to the Agreement" (Def. Motion at 6) fails because they mischaracterize key facts surrounding how the Agreement defines Seller and fail to cite cases that can actually support this specious argument.

#### a.  *DGP and Lowe Are Identified as Partners with PMC and Jalloh as the "SELLER" in the Agreement*

Defendants falsely state that the Agreement does not identify DGP or Lowe as parties to the Agreement and further allege that only Defendant PMC was identified as a contracting party (Def. Motion at 3, 5). However, the term "SELLER" is defined in the first clause of the Agreement as "**Delyon Lowe, Manager Director of Diverse Growth Partners** *in partnership* with **Private Markets Capital LLC**" (Compl. ¶¶ 4, 49, 50; Compl. Ex. 1) (bold emphasis in original) (italicized emphasis added). In describing the terms of the Agreement in Defendants' Motion, DGP and Lowe conveniently omit this key language (Def. Motion at 3, 5).

Additionally, in the "Factual Background" section of their Motion, Defendants first claim that PMC executed the Agreement (Def. Motion at 3) but then reverse course and concede that when "Mr. Lowe signed the Agreement, he did so 'on behalf of SELLER'" (Def. Motion at 6). Even so, Defendants still omit key language—Lowe signed the Agreement "*for* and on behalf of **SELLER**" in his capacity as "Manager Director" of "**Diverse Growth Partners, LLC**" (Compl. Ex. 1) (bold emphasis in original) (italicized emphasis added). The construction of the signature block that Lowe executed is the same as the construction of the signature block that A. Kerkar executed on the "BUYER" side, down to the use of bold font (Compl. Ex. 1). Defendants are comfortable concluding Cortana was the "BUYER" based on the plain language of the Buyer's signature block; therefore, it follows that Lowe and DGP were part of the "SELLER" based on the identical plain language of the Seller's signature block.

      b.   *Defendants Fail to Cite to Cases That Support Their Argument That Defendants Are Non-Parties*

A closer look at the cases cited by Defendants reveals that they do not in fact support their argument that Defendants are non-parties to the agreement.[1] First, Defendants cherry-pick

---

[1] Defendants repeatedly cite cases at the Summary Judgment posture, despite their bringing a Motion to Dismiss Cortana's complaint. The Summary Judgment standard is not dispositive at this stage, as all facts pled by Cortana

language from *Am. Property Const. Co. v. Sprenger Lang Foundation*, 768 F. Supp. 2d 207 (D.D.C. 2011), leaving out the key point that "a non-party" is defined as "*someone who has not assented to be bound to [a contract's] terms*." *Id.* at 211 (emphasis added). Here, Defendants Lowe and DGP did assent to be bound by the terms of the Agreement, as evidenced by the term "SELLER" being defined as "**Delyon Lowe, Manager Director of Diverse Growth Partners** in partnership with **Private Markets Capital LLC**," and Defendant Lowe executing the Agreement "for and on behalf of the SELLER" (Compl. ¶ 49; Compl. Ex. 1 at 3). If the definition of the term "SELLER" in the first clause and Lowe's signature on the third page of the Agreement is not enough, Defendants' conduct demonstrated an intent to be bound by the Agreement's terms. Specifically, Defendants:

- introduced Cortana to PMC following a meeting with Cortana about potential P2P BTC sellers (*Compl*. ¶¶ 30-33; 49-52);
- complied with the procedure enumerated on the second page of the Agreement and sent and received confirmations of BTC transfers to and from PMC and Cortana (*Id*. ¶¶ 64, 70, 73, 80-81, 84; Compl., Ex. 1 at 2); and
- communicated with Cortana and on behalf of PMC regarding the procedures set forth in the Agreement (*Id*. ¶¶ 63-64, 68,70, 72, 76, 82, 87).

Defendants' actions establish performance consistent with the Agreement's stated objectives. Accordingly, Defendants' execution of the Agreement "in partnership with" PMC and "for and on behalf of SELLER," participation in the facilitation of transactions, and receipt of a facilitator fee all support the conclusion that Defendants intended to be bound by the Agreement.

Defendants also attempt to rely on *Jones v. Quintana*, 872 F. Supp. 2d 48 (D.D.C. 2012), despite distinct factual differences rendering *Jones* inapposite to the instant action. In *Jones,* a

---

are to be taken as true. *Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 30 (D.D.C. 2022), *aff'd sub nom. Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024) (comparing Motion to Dismiss and Summary Judgment standards and establishing that the Summary Judgment standard can only be applied to a Motion to Dismiss on conversion by the court under Fed. R. 12(d) for inclusion of documents external to the pleadings or if defendant expressly moves for summary judgment in the alternative to a motion to dismiss).

union acted as the plaintiff's representative and agent in an employment dispute against her former employer. *Id.* at 57. In the settlement agreement between the union and former employer, the plaintiff is identified as and signed the settlement agreement as the "Grievant," whereas the union is identified as a "Party." *Id*. The court held that there was a genuine dispute of material fact as to whether the plaintiff was bound by the settlement agreement, because it was drafted to exclude the plaintiff as a party, the extent to which the Union had authority to act as plaintiff's agent was unclear, and the settlement agreement did not facially impose any direct obligations on the plaintiff. *Id.* at 58. Here, Defendants PMC and Lowe are identified in the first clause of the Agreement as in partnership on the "SELLER" side with Defendants PMC and Jalloh (Compl. ¶¶ 4, 49, 50; Compl. Ex. 1). Moreover, the Agreement imposes direct obligations on Defendants in their capacity as being part of the Seller's side (Compl. ¶¶ 53–57). And Defendant Lowe executed the agreement "for and on behalf of SELLER" in a signature block that was identical in construction to that of the Buyer (Compl. ¶¶ 4, 49, 50; Compl. Ex. 1), rather than a separate signature block identifying him by another defined term, as was the case in *Jones*.

In addition, Defendants rely on *Charlton v. Mond*, 987 A.2d 436 (D.C. 2010) to argue that dismissal of the breach of contract claim is appropriate (Def. Motion at 6, 7). However, the *Charlton* court granted the defendant's motion for summary judgment because no reasonable juror could find that one of the individual defendants was a party to either contract between the other individual defendant and the plaintiff. *Charlton*, 987 A.2d at 441. As stated *supra*, the language of the Agreement establishes that Defendants Lowe and PMC could reasonably be identified as parties to the Agreement.

Furthermore, Defendants rely on *Equitas Disability Advocates, LLC v. Bryant*, 134 F. Supp. 3d 209 (D.D.C. 2015) to argue that signing an agreement on behalf of another does not convert a

signatory into a party to the agreement (Def. Motion at 6). However, in *Equitas*, defendants were not expressly named in the relevant contract. Here, Defendants Lowe and PMC are both named expressly twice in the Agreement, both times in association with the term "SELLER" (Compl. Ex. 1; Compl. ¶¶ 4, 49, 50). Moreover, as stated above, the Agreement and parties' conduct demonstrate that Defendants intended to be bound by the Agreement, including the fact that Defendants agreed to specific facilitation obligations in exchange for a facilitator fee tied to the relevant transactions (Compl., Ex. 1 at 2).

Finally, under D.C. law, the "absence of one party's signature on the written agreement will not defeat or invalidate the contract if assent may otherwise be shown by the conduct of the parties." *Apprio, Inc. v. Zaccari*, 104 F.4th 897, 906–07 (D.C. Cir. 2024) (citation modified); *see also Davis v. Winfield,* 664 A.2d 836, 838 (D.C. 1995) (holding that failure to sign a copy of a lease was not determinative of the validity of the existence of a contract because the conduct of the parties should also be taken into account). Defendants do not argue that Defendant PMC failed to engage in conduct showing its assent to the terms of the Agreement. Despite the absence of Defendant Jalloh's signature on the written Agreement, Defendants confidently agree with Cortana that Defendant PMC is a party to the Agreement (Def. Motion at 5, 6). Therefore, even if Defendant Lowe did not sign the Agreement in his individual capacity, as was true for Defendant PMC, Defendant Lowe nevertheless assented to be bound through his conduct, as is detailed above.

## 2. *The Complaint Pleads Facts Sufficient to Show Defendants DGP and Lowe Had Obligations Under the Agreement*

As is explained in detail above, Defendants DGP and Lowe are identified as part of the Seller's side of the Agreement based on the definition of the term "SELLER" and Lowe's signature executing the Agreement "for and on behalf of the SELLER" (Opposition to Def.'s Motion, *supra* at (IV)(A)(1)). As partners to the Seller's side, Defendants DGP and Lowe are bound to perform

the contractual obligations enumerated in the Agreement similar to those required of PMC and

Jalloh.

As Defendants concede, the Agreement's operative provisions allocate all performance

duties to Buyer and Seller (Def. Motion at 8). Defendants' contractual obligations as "SELLER"

under the Agreement include performance of the following procedure:

> "(1) BUYER purchases USDT via their Coinbase. (2) BUYER transfers USDT (Polygon
> ERC20) to their Exodus wallet. (3) BUYER on September 19, 2025, 9:30 am Eastern
> engages with SELLER via Google Meet link OR Zoom. (4) BUYER performs a swap for
> a minimum amount of $120,000 USDT to JUSD and provides the SELLER with the
> dashboard screenshot before and after, along with the hash confirmation. (5) SELLER will
> transfer BTC to BUYER wallet address at spot price, then the balance after 22 Blockchain
> confirmations of initial transfer. (6) BUYER will send JUSD for the equivalent amount of
> BTC. (7) SELLER will make simultaneous payments to all facilitators in Bitcoin, 3% of
> each tranche of Bitcoin. (8) Repeat steps [4 – 7] until the contracted amount has been
> exhausted" (Compl., Ex. 1 at 2).

Defendants' obligations as "SELLER" also include payment of a "NON-PERFORMANCE

PENALTY in the amount of FIVE MILLION US DOLLARS ($5,000,000.00)" if "SELLER fails

to send Bitcoin to the BUYER after the BUYER has performed on each designated tranche"

(Compl., Ex. 1 at 3). Defendants breached performance of these obligations by failing to deliver

BTC equal to the USDT amount Cortana provided (Compl. ¶ 128) and failing to deliver BTC

within 45 minutes of Cortana's confirmed JUSD purchase (Compl. ¶¶ 73, 81, 87, 129).

Yet again, defendants misconstrue case law in efforts to assert that Defendants had no

obligations under the Agreement. For example, Defendants rely on *In re Fort Totten Metrorail*

*Cases Arising Out of the Events of June 22*, *2009*, 808 F. Supp. 2d 154 (D.D.C. 2011) to assert that

Defendants did not breach any obligations under the Agreement. As described above, however,

given their inclusion in the term "SELLER," Defendants did breach several enumerated

obligations under the Agreement. Additionally, the *In re Fort Totten* case dealt with allegations

that the third-party defendant should have refrained from informing the plaintiff about the third-

party plaintiff's potential involvement in an accident. *Id.* at 159. There, the court found that the relevant governing contractual provisions had no bearing on third-party defendant's decision to share this information and therefore dismissed the claim. *Id.* Here, the obligations imposed on Defendants in the relevant provisions of the Agreement *do* have bearing on Defendants' performance under the Agreement.

Further, Defendants cite *Bradley v. National Collegiate Athletic Association*, 249 F. Supp. 3d 149 (D.D.C. 2017), which is factually inapposite to the instant case. In *Bradley,* the plaintiff failed to identify any provisions in any contracts that created obligations or duties owed by the plaintiff, therefore the court dismissed the breach of contract claim. *Id.* at 183. Here, however, the Agreement is a valid contract creating obligations for Defendants' performance as part of the Seller's side through the several provisions detailed above in conjunction with their role as the Sell Side Facilitators.

As such, Defendants' argument that Cortana has not sufficiently alleged Defendants' obligations under the Agreement fails.

### 3. *The Complaint Pleads Facts Sufficient to Show that Defendants DGP and Lowe Could Be Held Liable as Defendant PMC's Agent*

Defendants highlight the absence of any argument by Cortana that Defendant DGP or Defendant Lowe acted as Defendant PMC's agent (Def. Motion at 7). As discussed thoroughly above, Sections (IV)(A)(1) and (2) *supra*, Cortana's position is that Defendants DGP and Lowe are part of the Seller side as defined in the Agreement. That said, Cortana's Complaint sufficiently pleads facts to survive a motion to dismiss on an agency theory. First, an agent must possess authority to act on the principal's behalf. *Ruffin v. Temple Church of God in Christ, Inc*., 749 A.2d 719, 722 (D.C. 2000). Here, there are sufficient facts alleged in the Complaint that Defendants DGP and Lowe had implied authority, *i.e.* they reasonably believed Defendant PMC consented to

their actions based on Defendant PMC's conduct or words. *Ruffin*, 749 A.2d at 722 (quoting *Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1217–18 (D.C. 1991) ("'Implied authority is actual authority inferred from the circumstances, such as the relationship between the parties and conduct of the principal toward the agent manifesting the principal's consent to have the agent act for him.' Implied authority, therefore, exists when . . . '[a] servant or agent is authorized to do anything which is reasonably regarded as incidental to the work specifically directed or which is usually done in connection with such work.'") (citations omitted). Unlike actual authority, implied authority does not require a third party reasonably believe that the principal consented to the agent's exercise of authority. *Id; see also Smith v. Wells Fargo Bank*, 991 A.2d 20, n.13 (D.C. 2010).

Defendants DGP and Lowe reasonably believed they had been authorized by Defendant PMC to:

- introduce Cortana to PMC following a meeting with Cortana about potential P2P BTC sellers (*Compl*. ¶ ¶ 30–33; 49–52);
- send and receive confirmations of BTC transfers to and from PMC and Cortana (*Id*. ¶ ¶ 64, 70, 73, 80–81, 84); and
- communicate with Cortana on behalf of PMC regarding the procedures set forth in the Agreement (*Id*. ¶ ¶ 63–64, 68,70, 72, 76, 82, 87).

Thus, these facts show that Defendants DGP and Lowe believed Defendant PMC consented to Defendants DGP and Lowe taking these actions on its behalf, therefore importing implied authority as Defendant PMC's agents.

Defendants rely on *Henderson v. Phillips*, 195 A.2d 400 (D.C. 1963) to make a convoluted argument that Defendants DGP and Lowe cannot be held liable under the Agreement as agents for Defendant PMC because Defendant PMC's name appears in the Agreement (Def. Motion at 7). However, Defendants misrepresent the legal standard articulated in *Henderson*. Specifically, Defendants omit the following language: "[W]hen an agent enters into a contract without

15

disclosing both the identity of his principal as well as the fact of his agency relationship, he becomes personally liable on the contract." *Henderson*, 195 A.2d at 401–02. The *Henderson* court further explains an agent is not liable for a principal's default if the agent "acts in good faith" on behalf of the principal. *Id.* at 402.

Here, the true nature of the "agency relationship" between Defendants DGP and Lowe and Defendants PMC was never fully disclosed to Cortana, either orally or in writing. Nowhere are Defendants DGP and Lowe identified as agents. Instead, they are described as partners with Defendants PMC and Jalloh. Further, Defendants Lowe and DGP did not act in good faith. For example, Defendants:

- failed to deliver BTC equal to the USDT amount Cortana provided (Compl. ¶¶ 16, 19, 88);

- failed to transfer JUSD back to USDT despite representing at numerous points that this could be done immediately upon request (Compl. ¶¶ 7, 16, 46, 47, 86-88); and

- deployed asset fragmentation, swap protocols, cross-chain transfers, and comingling to conceal the origin and movement of Cortana's cryptocurrency (Compl. ¶ 114).

Due to the ambiguity of Defendants' defined relationship with Defendants PMC and Jalloh, and because Defendants Lowe and DGP did not act in good faith on behalf of Defendant PMC, Defendants Lowe and DGP are personally liable as Defendant PMC's agents under the Agreement.

Due to the foregoing, Defendants' arguments that DGP and Lowe cannot be held liable as PMC's agent fails.

### 4. *Because There is a Contractual Relationship Between Defendants DGP and Lowe and Plaintiff, the Covenant of Good Faith and Fair Dealing is Applicable*

Under District of Columbia law, "[a]ll contracts 'contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Paulin v.*

*George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 247 (D.D.C. 2012))
(quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006)). Defendants attempt to deny
the applicability of the covenant of good faith and fair dealing by repeating the argument that no
contractual relationship existed between Defendants and Cortana. Specifically, Defendants rely on
*Iyer v. George Washington Univ. Sch. of Med. & Health Scis.*, No. 24-130 (SLS), 2025 WL
2192985, at *14 (D.D.C. Aug. 1, 2025) to argue that a duty of good faith and fair dealing "cannot
exist in the absence of a contractual relationship." *Id.* (Def. Motion at 8). But, as explained in detail
above, a contractual relationship did exist between Defendants and Plaintiff under the
Agreement—Defendants were named as part of the Seller's side, Lowe executed the Agreement
"for and on behalf of the SELLER," and the Seller's obligations under the Agreement are clearly
identified (Opposition to Def.'s Motion, *supra* at (IV)(A)(1) and (2)).

Moreover, Defendants' own case law supports Cortana's position that their Motion should
be denied as to this claim. In *Iyer*, the plaintiff brought numerous claims against her former medical
school, including for disability discrimination, breach of contract, and breach of the covenant of
good faith and fair dealing. *Iyer*, 2025 WL 2192985, at *1. The court granted the defendants'
motion to dismiss on the breach of covenant of good faith and fair dealing claim because the
Plaintiff failed to include in the pleadings any contract prohibiting discrimination and the court
found the Plaintiff's allegations of bad faith were too conclusory. *Id.* at *14.

Here, by contrast, Cortana details Defendants' obligations under the Agreement and cites
numerous facts supporting bad faith, and arbitrary and capricious conduct on behalf of Defendants,
including:

- Defendants failed to deliver BTC equal to the USDT amount Cortana provided
  (Compl. ¶¶ 16, 19, 88);

- Defendants failed to transfer JUSD back to USDT despite representing at numerous points that this could be done immediately upon request (Compl. ¶ ¶ 7, 16, 46, 47, 86-88); and

- Defendants deployed asset fragmentation, swap protocols, cross-chain transfers, and comingling to conceal the origin and movement of Cortana's cryptocurrency (Compl. ¶ 114).

Because Cortana brings the breach of covenant of good faith and fair dealing claim under an existing contractual relationship, includes the Agreement in full in the pleadings, and provides sufficiently detailed facts to support a finding of bad faith by Defendants, and for all of the reasons stated in the foregoing sub-sections of Section (IV)(A), Defendants' Motion should be denied as to Complaint's breach of contract and good faith and fair dealing claims.

B. **Cortana's Complaint Complies with the Appropriate Pleading Rules**

Defendants' Motion mischaracterizes Cortana's pleadings and the cited case law to muddy the waters in an attempt to escape clear liability for their fraud and wrongdoing.

1. *Cortana's Complaint Meets the Rule 9(b) Pleading Standard*

While Federal Rule of Civil Procedure 9(b) requires a party to plead "with particularity the circumstances constituting fraud," Rule 9(b) "does not abrogate Rule 8, and it should be harmonized with the general directives . . . that the pleadings should contain a 'short and plain statement of the claim or defense . . . . '" *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quotation and citation omitted). Rule 9(b) requires that the complaint "state the time, place and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud." *Id.* at 1256 (quotation omitted). Even with these requirements, Rule 9(b) does not have a "preordained checklist" of requirements, but rather requires that courts apply the Rule on a case-by-case basis, considering whether there is "sufficient substance" in the pleadings to provide defendants the

opportunity to respond and to justify proceeding with the case. *Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of United States*, 325 F.R.D. 6, 13, 15 (D.D.C. 2018).

The Complaint undisputedly provides Defendants sufficient notice of the claims against them with the details available to Cortana regarding the fraudulent scheme. Here, the Complaint alleges that DGP introduced Cortana to PMC and represented that PMC was a "Verified Seller" of DGP, that the Agreement was between Cortana, DGP, and PMC, and that there was a coordinated effort between DGP and PMC to defraud Cortana (Compl. ¶¶ 2, 4, 18). The Complaint continues that Defendants' involvement in Utila helped assuage concerns about the legitimacy of the deal and the involved parties, adding weight to DGP's position as a broker for Bitcoin sellers, and provided assurances to Cortana that JUSD was reputable, all the while knowing that these representations were false and causing Cortana to act on these representations. (*See, e.g.,* Compl. ¶¶ 35–36, 42, 48, 82, 89, 91, 109–111). The Complaint provides a clear timeline of events: Cortana was introduced to DGP on September 8, 2025; on September 10, 2025, Cortana executed an invoice with DGP for access to Utila; Cortana transferred money to its Utila wallet on September 18, 2025; DGP introduced Cortana to PMC and executed the Agreement on September 19, 2025; and the first tranche was initiated that same day (Compl. ¶¶ 2, 4, 36, 37, 49, 61). On September 20, 2025, DGP told Cortana that it should swap directly with PMC, initiating the exchange crucial to Defendants' scheme (Compl. ¶¶75, 83–88). The Complaint identifies that the misrepresentations occurred through both oral and written meetings and other communications during this specified timeframe (*See, e.g.,* Compl. ¶¶ 2, 32, 34–36, 41–42, 44, 46–48, 63, 72–73, 76, 77, 80–82, 87, 89, 91); *see Heidi Aviation, LLC v. Jetcraft Corp.*, 573 F. Supp. 3d 182, 204 (D.D.C. 2021) (finding that the Rule 9(b) standard is met when Plaintiff provided "a narrow range of dates during which the alleged misrepresentations took place . . . ."). Further and as required, the Complaint clearly

states the content of the false misrepresentations, the facts misrepresented and what was lost as a

consequence of the fraud as further described below.

In addition, Cortana has met the elements of fraudulent misrepresentation. Fraudulent

misrepresentation requires a defendant to (1) make a false representation; (2) in regard to a material

fact; (3) knowing that the fact was false; (4) with intent to deceive plaintiff; (5) leading plaintiff to

act in reasonable reliance on the representation; (6) leading to damages. *Democracy Partners v.

Project Veritas Action Fund*, 285 F. Supp. 3d 109, 116–17 (D.D.C. 2018). At the outset, the

Complaint details that DGP represented that its list of "Verified Sellers"  which included

Defendants PMC and Jalloh had gone through DGP's "Know Your Customer" process (Compl. ¶¶

33, 41). This was obviously false as Defendant Jalloh, Defendant PMC's Chief Portfolio Manager,

had previously been convicted of eight counts of wire fraud and there were other publicly available

indicators that PMC was an illegitimate business (Compl. ¶¶ 24, 115–121). To add legitimacy to

their scheme, Defendants falsely claimed that Lowe was a shareholder in Utila, a reputable trading

platform (Compl. ¶ 34), which later proved to be false upon contact being made with Utila by a

Cortana business partner (Compl. ¶¶ 29, 91). Defendants' attempts to deflect from this fact by

seemingly arguing that the representation that Lowe is a shareholder of Utila, even if assumed true,

has no connection to the fraud is counter to established precedent (Def. Motion at 13). "Under

District of Columbia law, a 'statement literally true' is nonetheless 'actionable if made to create a

false impression.'" *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 196 (D.D.C. 2016) (citing *Remeikis

v. Boss & Phelps, Inc.*, 419 A.2d 986, 989 (D.C.1980)). Further, "[a] representation stating the truth

so far as it goes but which the maker knows or believes to be materially misleading because of his

failure to state additional or qualifying matter is a fraudulent misrepresentation." *Id*. (quoting

Restatement (Second) of Torts §529 (1977)). So, even if Lowe was a shareholder of Utila, Lowe's

statements would still be actionable as they were made to create a false impression of Lowe and PMC's legitimacy.

As the Complaint details, Defendants DGP and Lowe also provided repeated assurances that JUSD was a reputable stablecoin that could be traded for BTC or otherwise swapped at any time back to USDT, and assisted Cortana in calculating the BTC value of the JUSD, giving Cortana the assurances needed to move forward with the deal, all the while knowing that JUSD was actually an unstable token that lacks the market value of a stablecoin. (Compl. ¶ 42, 46–47, 82, 109–111). Cortana moved forward in reliance these representations, causing Cortana to suffer over $8 million in damages as a consequence. While Defendants argue that Cortana's allegations "do not connect any specific representation to any specific transaction or loss," this is blatantly untrue. (Def. Motion at 12). Defendants downplay the significance of the representations about Lowe's connection to Utila in creating trust in the trading relationship between the Parties, the sophistication of the fraudulent scheme in conducting the deal through various tranches, and the role that DGP played in assuring Cortana that the JUSD was a stablecoin

Finally, despite knowing that the transactions were not being executed as planned under the terms of the Agreement, Defendant Lowe and a representative from Defendant DGP continued to fraudulently represent that Defendants PMC and Jalloh were able to effectuate the Bitcoin transfers and induced Cortana to move off the Utila platform to swap directly with Defendant PMC (Compl. ¶¶ 67–78). Defendant DGP did so knowing that Defendants PMC and Jalloh could not complete the transfers and continued to make excuses for PMC's lack of performance once demands were made that the JUSD be swapped back to USDT (Compl. ¶¶ 85–87). All of these fraudulent representations and assurances led Cortana to reasonably rely on the legitimacy of the deal to their significant detriment, contrary to Defendants' assertions.

In a disingenuous effort to argue that the Complaint vaguely refers to "Defendants" without specifying statement attribution, Defendants gloss over the factual record (Def. Motion at 11). The Complaint never alleges that Cortana spoke directly to PMC or Jalloh or ever directly dealt with PMC. All communications went through DGP and/or Lowe, providing sufficient notice to Defendants. Indeed, the Declaration of Anthony Kerkar[2] attached to the Complaint's Appendix affirmatively states that "Cortana has had no direct contact with Defendant PMC" and that "throughout the entirety of the transactions Defendant DGP and its representatives purportedly relayed messages from Defendant PMC to Cortana and purportedly relayed messages from Cortana to Defendant PMC." (Decl. A. Kerkar, ¶¶ 15–16). Even if it were not apparent who made the misrepresentations, this Court has already established that the Rule (9b) standard is met when "[t]here is little risk that Defendants will face difficulty answering the allegations made against them merely because the Complaint fails to specify which Defendant made the alleged fraudulent representations or material omissions." *Jacobson,* 168 F. Supp. 3d at 205–06 (holding that the Rule 9(b) standard was met despite referring to "Defendants" collectively since there were only two Defendants involved and Defendants "are not in any meaningful way disadvantaged by that modest deficiency."); *Heidi Aviation, LLC.*, 573 F. Supp. 3d at 204 (holding that Plaintiff met the heightened pleading standard despite not explicitly explaining which representations were made by which defendants since Plaintiff had identified the relevant individual and other participants in her pleadings).

Since the elements of fraudulent misrepresentation are met, so is the standard for negligent representation, as negligent misrepresentation requires the same elements without the scienter

---

[2] *E.E.O.C. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.D.C. 1997) (holding that a Court may consider "the facts alleged in the complaint, *any documents either attached to or incorporated in the complaint* and matters of which we may take judicial notice" in determining whether a complaint fails to state a claim) (emphasis added).

requirements for fraud. *Jacobson v. Hofgard*, 168 F. Supp. 3d at 206. As such, the Counts Six and Seven of the Complaint satisfy Rule 9(b)'s pleading standard and must survive the motion to dismiss.

### 2. *Cortana's Complaint Complies with Rule 8's Pleading Standard and Does Not Engage in Improper Group Pleading*

Cortana's Complaint (including the attached appendix and exhibits) provides Defendants fair notice of the claims against them. *See* Section (IV)(B)(1), *supra.* Defendants' cited case law does not move the needle. In the Summary Opinion, *Atuahene v. City of Hartford*, plaintiff filed his complaint against the City of Hartford, Charles Ayers, Caponetto Enterprises LLC, Valdis Vinkels, Precision Foreign Car Service, and John and Jane Does, "employees of the aforementioned defendants," in a complaint alleging various constitutional violations and torts including trespass, tortious interference with contractual relations, slander of title, civil rights violations, condemnation, conspiracy, racial discrimination, and deprivation of equal protection. Brief of Defendant-Appellee, City of Hartford. *Atuahene v. City of Hartford,* No. 00-7711 (2d Cir. Dec. 18, 2000). Similarly, in *Melegrito v. CitiMortgage Inc.,* the court found that the complaint "appears to be entirely boilerplate with the exception of the "Special Allegations" section and a few portions of the articulated claims," and did not distinguish between CitiMortgage and the title company. No. C 11-cv-01765, 2011 WL 2197534, at *1, 6 (N.D. Cal. June 6, 2011). Here, Cortana's complaint is over twenty pages and outlines the fraudulent scheme, the parties involved, the role each party played, and Defendants' actions. It is not a boilerplate pleading that contains unidentified parties and/or wide-reaching claims. Instead, the Complaint contains specific allegations regarding each Defendants' role in the fraudulent trading scheme that provides each Defendant with fair notice of the claims against them and the grounds for relief.

Furthermore, in *Caldwell v. Argosy Univ.*, the court explained that plaintiff's complaint did not contain any "allegation of harm" against one party and had "no connection between the cause of action cited and the facts that Caldwell alleges" in claims against other defendants. 797 F. Supp. 2d 25, 27 (D.D.C. 2011). That is clearly not the case here. As the court affirmed, "the purpose of this standard [Rule 8(a)] is to give fair notice to the defendants of the claims asserted that is sufficient to prepare a responsive answer and an adequate defense and to determine whether the doctrine of *res judicata* applies." *Id.* Plaintiff has satisfied that requirement here. Finally, in *United States ex rel. Bender v. North American Telecommunications, Inc.*, plaintiff's amended complaint only contained one sentence connecting defendants to the fraudulent acts alleged, leading the court to dismiss certain counts for failure to state a claim. 750 F. Supp. 2d 1, 6 (D.D.C. 2010), *aff'd*, 499 F. App'x 44 (D.C. Cir. 2013). Here, Defendants' role in the fraud is described over multiple pages in the complaint, providing ample notice. As described above, Cortana had no direct contact with PMC and relied on Defendants' role as broker to facilitate the transaction (Decl. A. Kerkar, ¶¶ 15–16). The role of each Defendant in the contract is clearly identified by its specific terms (Compl. Ex. 1). Finally, the part each Defendant played in executing the fraudulent transactions is explicitly delineated (Compl. ¶¶ 61–88). Defendants' attempts to paint DGP as a passive observer in a relationship between PMC and Cortana does not match the Complaint or reality (Def. Motion at 10), and the Rule 8 pleading standard is met.

### C. Cortana's Complaint Adequately States a Claim in the Alternative for Promissory Estoppel

Defendants' Motion argues that Cortana has not adequately pled its claim of promissory estoppel because Plaintiff fails to identify a promise made by DGP or Lowe (Def. Motion at 14).[3]

---

[3] Defendants also argue that Plaintiff cannot proceed with both a breach of contract claim and a promissory estoppel claim. Def. Motion at 14. As clearly stated in its Complaint, Plaintiff makes this promissory estoppel claim in the

In fact, the promises alleged by Cortana to have been made by Defendants are sufficient to state a claim for promissory estoppel. Indeed, Defendants' own case law states that under promissory estoppel, promises "need not be as specific and definite as a contract." *Intelect Corp. v. Cellco P'ship GP*, 160 F. Supp. 3d 157, 193 (D.D.C. 2016).

As noted by Defendants, Cortana alleged that Defendants' promises included that DGP was a shareholder in Utila (Compl. at ¶ 136). However, this was not just a statement of fact— indeed as a part of being a shareholder in Utila, Defendant Lowe promised that it could fast-track Cortana's onboarding onto Utila and offer a reduced price for access to the platform to facilitate transactions (*See* Compl. ¶ 34). This allegation was clearly incorporated into Cortana's claim for promissory estoppel at Compl. ¶ 135. Similarly, DGP's promise that JUSD was a reputable stablecoin cannot be parsed out from its promise that *because* of that fact, Cortana could swap any purchased JUSD back to USDT at any time (*See* Compl. ¶¶ 42, 43, 46, 47, 135, 136). Furthermore, contrary to Defendants' assertion in their Motion at p. 14–15, Plaintiffs provide sufficient detail in Compl. ¶¶ 42 and 46 that DGP, through Lowe, represented that JUSD was a reputable stablecoin, facts which are incorporated into Plaintiff's promissory estoppel claim in Compl. ¶ 135.

Defendants attempt to cite *Headfirst Baseball LLC v. Elwood*, 168 F. Supp. 3d 236, 248 (D.D.C. 2016)—another summary judgment case—for support that these promises Defendants made to Plaintiff were not expressions that DGP or Lowe would conduct themselves in a specified way or bring about a specified result. (Def. Motion at 14). However, in *Headfirst,* the court found there was not a clear promise to start a business because the details surrounding the promise to start a business were too vague, for example, the counterclaim plaintiff did not provide any evidence detailing the nature of the business, the business objective, etc. Here, the details

---

alternative in the event its breach of contract claim were not to survive by alleging promissory estoppel in Count Three as being "Outside of the Agreement." (*See* Compl. ¶ 136).

surrounding the promise were very clear, as Cortana had several discussions with Defendants DGP and Lowe about Cortana's desire to purchase Bitcoin, which DGP and Lowe must have understood given Lowe introduced PMC to Cortana for the purpose of obtaining Bitcoin (Compl. ¶¶ 30–32, 41, 46).

Defendants argue that Plaintiffs alleged only PMC promised that BTC would be delivered in 45 minutes (Def. Motion at 15). However, this ignores key facts pled by Plaintiff in declarations attached to the Complaint, specifically that Defendant DGP (via Defendant Lowe) also represented that "Bitcoin (BTC) would be delivered to Cortana within forty-five (45) minutes of Cortana's confirmed purchase of JUSD." *See* Decl. A. Kerkar, ¶10; *see* n.2, *supra.* Since Defendants made several explicit and significant promises that were reasonably relied on to the detriment Cortana, Defendants Motion as to Promissory Estoppel should be denied.

### D.  Cortana's Complaint Adequately States a Claim for Unjust Enrichment

Defendants' Motion asserts that Cortana's unjust enrichment claim must fail because Cortana does not allege that Defendant DGP or Lowe received any benefit from the Agreement and transactions at issue (Def. Motion at 15). However, the specific terms of the Agreement and receipt of digital assets by the "Seller Side" both constitute significant benefits received by Defendants. Defendants cite *Rapaport v. U.S. Department of Treasury, Office of Thrift Supervision*, 59 F.3d 212, 217 (D.C. Cir. 1995) to support their position that Defendants received no benefit conferred upon them by Cortana. However, in *Rapaport*, the only allegation of a "benefit" was the petitioner's failure to pay an amount he allegedly owed under an agreement. *Id.* The Court reasoned that failure to pay as allegedly required under a contract does not without more constitute a benefit restitution, and a plaintiff's loss without some form of enrichment on behalf of a defendant does not suffice. *Id.* at 217–18.

The Complaint specifically alleges that Cortana transferred the equivalent of $12,477,144,28 USD in USDT across four cryptocurrency transfers both Utila and directly to a **DGP** and PMC controlled wallet (Compl. ¶ 94). In return, Cortana only received BTC in the amount of $4,354,051.23 USD from PMC in violation of the Agreement (Compl. ¶ 95). Furthermore, the Agreement, which was attached to the Complaint itself explicitly references a facilitation fee to be paid to a certain cryptocurrency wallet in exchange for Defendants DGP and Lowe successfully serving as a facilitator on the "Seller Side" (Compl. Ex. 1 at 1). No additional specific allegations are needed at the pleadings stage. *See McWilliams Ballard, Inc. v. Level 2 Dev.*, 697 F. Supp. 2d 101, 107 (D.D.C. 2010) (citing *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.,* 525 F.3d 8, 16 (D.C. Cir. 2008)). In *McWilliams Ballard, Inc.*, the plaintiff alleged that it conferred a benefit on defendants when it made a loan to them. 697 F. Supp. 2d at 106. The plaintiff alleged the defendants retained the benefit because the loan had not been repaid. *Id.* at 106–07. Finally, the plaintiff alleged that allowing the defendants to retain the benefits of the loan without repayment would be unjust, unfair, and inequitable. *Id.* at 107. The Court held that no other specific allegations were needed at the pleadings stage. *Id.* (citing *Aktieselskabet AF 21. Nov. 2001,* 525 F.3d at 16).

As stated above, Cortana alleged in the Complaint the benefit conferred upon Defendants in the form of transferred digital assets and a facilitation fee derived from the digital assets provided to Defendants PMC and Jalloh. Also as alleged in the Complaint, Defendants' retained the benefit in the form of digital assets and laundered them through a series of complex transactions (Compl. ¶¶ 98–107; Decl. J. Maile, ¶¶ 12–32). Contrary to Defendants' assertion, Cortana's blockchain tracing did not identify only PMC-affiliated or third-party wallets (Def. Motion at 15–

16).[4]  Instead, the Declaration of cryptocurrency tracing forensic expert Justin Maile specifically states that the wallet address cannot be linked to real-world individuals through publicly available blockchain data alone (Decl. J. Maile, ¶ 33). As such, discovery is needed to determine who indeed has exerted control over all of wallets at issue. Regardless of who owns the wallets now, allowing Defendants to retain the equivalent of $8,123,093.05 in digital assets provided by Cortana would be unjust, as alleged in the Complaint (Compl. ¶ 134). Since Cortana has appropriately pled all the essential elements of an unjust enrichment claim under D.C. law, Defendants' Motion to dismiss the unjust enrichment claim should be denied.

### E.  Cortana's Complaint Adequately States a Claim for Civil Theft

Defendants' argument surrounding Cortana's civil theft claim suffers from an overly narrow reading of the applicable statute. Under D.C. law, a person commits theft if that person wrongfully obtains or uses the property of another with intent: (1) to deprive the other of a right to the property or benefit of the property; or (2) to appropriate the property to his or her own use or to the use of a third person. D.C. Code § 22-3211(b). "Wrongfully or obtains or uses" is further defined as "obtaining the property by trick, false pretense, false token, tampering, or deception." D.C. Code § 22-3211(a). This includes conduct previously known as larceny by trick, embezzlement, and false pretenses. *Id.*

Defendants' sole argument here is that Cortana did not allege that DGP or Lowe ever came into possession of Cortana's property (Def. Motion at 16). As discussed above, this premise is

---

[4] Defendants appear to rely in a footnote on facts derived from other filings in this case external to the Complaint and documents attached to the Complaint. As the case law is clear, in determining whether a complaint fails to state a claim, a Court may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which the Court may take judicial notice. *E.E.O.C.* 117 F.3d at 624–25 (D.C. Cir. 1997) (citing *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017–18 (5th Cir. 1996)). Therefore, Defendants' use of those facts as cited in their footnote is improper for the purpose of these pleadings and the Court should disregard these facts in considering Defendants' Motion.

incorrect. However, even assuming it is an accurate statement, D.C.'s theft statute does not require that Cortana's property ever came within the possession of Defendants. Under the plain language of the statute, it is enough that Defendants wrongfully used the property of Cortana with the intent to appropriate the property for the use of a third person. Exercising control and making an unauthorized transfer of an interest do not require that Defendants ended as the final holders of the cryptocurrency. This language covers anyone who orchestrates, directs, or causes the transfers through deception or trick, even if the assets flow through wallets nominally tied to a different defendant. Likewise, "obtaining property by trick [or] false pretense" focuses on how the property was induced out of Cortana's hands, not on whether the trickster ultimately retains the property in their own wallet.

As argued above and pled in the Complaint, Defendants fraudulently induced Cortana to transfer their property in the form of digital assets to the Utila platform and then directly to a specific wallet. Cortana's assets were misappropriated under the false pretenses that they were entering into an arrangement with a verified cryptocurrency trader. Instead, Defendants wrongfully used the digital assets with the intent to appropriate the assets to the use of either themselves or another. Either end result would meet the elements of the theft statute. Therefore, even under Defendants' theory of the cryptocurrency wallet ownership, the Complaint validly states a claim under D.C. statutory law. For these reasons, the Defendants' Motion as to the civil theft claim should be denied.

**F.** **Cortana's D.C. Consumer Protection Procedures Act Claim Adequately States a Claim Upon Which Relief Can be Granted**

The District of Columbia Consumer Protection Procedures Act ("CPPA") prohibits unfair or deceptive trade practices that include representing:

> (a) [] that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;
>
> (b) [] that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have…
>
> (d) [] that the goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;
>
> (e) [] misrepresent as to a material fact which has a tendency to mislead…; and
>
> (f) fail to state a material fact is such failure tends to mislead.

D.C. Code § 28-3904. The CPPA is a "comprehensive statute designed to provide procedures and remedies for a broad range of practices which injure consumers." *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 90 (D.D.C. 2016) (quoting *Sundberg v. TTR REALTY, LLC*, 109 A.3d 1123, 1129 (D.C. 2015) (internal quotation marks and citation omitted)). Courts "have long considered the CPPA to be a remedial statute that must be 'construed and applied liberally to promote its purpose.'" *Id.* (quoting D.C. Code § 28-3901(c)). The CPPA covers trade practices "arising out of consumer-merchant relationships." *Sundberg*, 109 A.3d at 1129 (quoting *Snowder v. District of Columbia*, 949 A.2d 590, 599 (D.C. 2008)). As Cortana has alleged a valid consumer-merchant relationship between itself and Defendants and the services fall within the scope of the CPPA, Cortana has standing to bring the D.C. Consumer Protection Procedures Act Claim.

## 1. *Defendants are Merchants Under the CPPA*

The term "merchant" is defined in the CPPA as a person "who in the ordinary course of business does or would sell, lease, or transfer, either directly or indirectly, consumer goods or services" or a person who "in the ordinary course of business does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code § 28-3901(a)(3)(A). "Goods and services" under the CPPA means "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process, and includes consumer credit, franchises, business opportunities, real estate transactions, and consumer services of all types." D.C. Code § 28-3901(a)(7). As alleged in the Complaint, Defendant DGP is a

strategic investment and advisory firm that provides capital and operational expertise to facilitate transactions and develop business opportunities in emerging markets (Compl. ¶ 21). Since Defendant DGP advertised and represented itself as providing investment advisory services, it satisfies the definition of merchant within the CPPA.

The District of Columbia Court of Appeals (DCCA) has previously held that the definition of merchant is satisfied in situations comparable to DGP's investment advisory services. For instance, the DCCA found a merchant-consumer relationship in the context of someone who presented himself as a "foreclosure specialist" who would help an individual keep her home. *Byrd v. Jackson*, 902 A.2d 778, 781 (D.C. 2006). In *Byrd,* the Court evidence of a written agreement or payment for such foreclosure-avoidance services were not required under the CPPA. *Id.* Instead, it was enough that these services were advertised or offered to the appellee "without the intent to sell them…as advertised or offered." *Id.* (quoting D.C. Code § 28-3904(h)). Further, there was amble evidence to support a finding that the appellant had advertised himself to the appellee as one who would help her avoid foreclosure, and that she dealt with him on that understanding. *Byrd,* 902 A.2d at 781. The appellant had mailed a notice advising of the services offered by his company Creative Investment Company, assisted the appellee in a bankruptcy filing, and met with her repeatedly either himself or through an intermediary. *Id.*

Here, Defendants similarly advertised themselves to the public and Cortana as an investment firm that would provide services in the form of capital and operational expertise (Compl. ¶¶ 1, 21). Defendants further represented that Defendant Lowe was a shareholder in a legitimate cryptocurrency trading platform and spoke to Cortana on multiple occasions to earn their trust (Compl. ¶¶ 34-48). Defendants then procured prospective trading partners for Cortana and facilitated the execution of a written agreement to memorialize a business opportunity (Compl.

¶¶ 41, 48). Given that Defendants provided the type of business opportunity and consumer services to Cortana contemplated by the CPPA, they qualify as merchants for purposes of the statute.

### 2. *Cortana is a Consumer Under the CPPA*

A consumer under the CPPA is defined as "a person who, other than for purposes of resale, does or would purchase…or receive consumer goods or services…or does or would otherwise provide the economic demand for a trade practice."  D.C. Code § 28-3901(2)(A). "Consumer" status at bottom turns on whether an individual or entity provides "economic demand for "consumer goods and services." *Stone v. Landis Const. Co.*, 120 A.3d 1287, 1289 (D.C. 2015). A consumer in consumer transaction is allowed to have a financial motive. *Ford v. Chartone, Inc.*, 908 A.2d 72, 83 (D.C. 2006). As long as the transaction is not engaged in as a part of the regular business of purchasing or selling the goods or services in question, it can fall within the coverage of the CPPA. *Id.* at 83-84 (citing *Adam A. Weschler & Son*, *Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989)).

The Complaint describes that Cortana is a multi-asset strategy fund that utilizes cryptocurrency assets for daily operations and growth (Compl. ¶¶ 1, 19). There are no allegations in the Complaint that Cortana regularly solicits the advisory expertise of firms such as Defendants to regularly buy and resell cryptocurrency assets. While Cortana's P2P trading may have been financial in nature, they utilized such assets to pay for daily operations. This constitutes the type of use for personal purposes envisioned by the CPPA. As such, Cortana's status as a consumer in this particular services arrangement provides them standing under the CPPA.

### 3. *Defendants Engaged in Unfair or Deceptive Trade Practices*

As argued above, Defendants engaged in multiple aspects of unfair or deceptive trade practices of the type that fall within the ambit of the CPPA. For instance, Defendants falsely

misrepresented that Lowe had an affiliation with the Utila platform that turned out to be false and misleading. (Compl. ¶¶ 11, 34). In addition, Defendants represented that Defendants PMC and Jalloh were verified sellers of cryptocurrency, which was a factual assertion that had a tendency to mislead. (Compl. ¶¶ 3, 33). Indeed, Defendant Jalloh's status as a convicted felon was material fact that was withheld and also misled Cortana into this failed venture. (Compl. ¶¶ 41, 45, 115-21). Defendants' representations about the value of JUSD were also materially misleading. (Compl. ¶¶ 5, 15, 42). Since a valid merchant-consumer relationship was established and Defendants engaged in unfair or deceptive trade practices, the Court should deny Defendants' Motion to Dismiss the D.C. Consumer Protection Procedures Act Claim.

### V.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

Dated: January 12, 2026                    Respectfully submitted,

                                           **FOLEY & LARDNER LLP**

                                           By: */s/ Olivia S. Singelmann*
                                                          Counsel

                                           Olivia S. Singelmann (D.C. Bar No. 1016299)
                                           Telephone: (202) 295-4146
                                           Jack Korba (D.C. Bar No. 1010303)
                                           Telephone: (202) 295-4110
                                           FOLEY & LARDNER LLP
                                           3000 K Street, N.W., Suite 600
                                           Washington, DC 20007

                                           *Attorneys for Plaintiff Cortana Global LLC*

33

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2026, a true and correct copy of the foregoing document was served via CM/ECF on all counsel of record.

By: <u>*/s/ Olivia S. Singelmann*</u>
Counsel for Plaintiff